**FIFTH DIVISION
PHIPPS, P. J.,
DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 29, 2016**

# In the Court of Appeals of Georgia

A16A0257. OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY v. RM KIDS, LLC.

A16A0258. RM KIDS, LLC v. OLD REPUBLIC NATIONAL
TITLE INSURANCE COMPANY.

DILLARD, Judge.

RM Kids, LLC, filed suit against Old Republic National Title Insurance Company ("Old Republic"), alleging, *inter alia*, breach of contract and bad faith refusal to pay a claim under a policy of lender's title insurance issued by Old Republic. Following a lengthy trial, a jury rendered a verdict in favor of RM Kids and awarded $7,100,000 in damages. Shortly thereafter, the trial court issued a judgment affirming the jury's verdict, and both parties filed cross-appeals.

In Case No. A16A0257, Old Republic contends that the trial court erred in ruling that the date of RM Kids's loss was the date its predecessor-in-interest closed

on the loan for the subject property rather than the date RM Kids foreclosed on the property. Moreover, Old Republic argues that even if the date of the loss was, in fact, the closing date, the trial court, nevertheless, erred in ruling that RM Kids had standing to assert a claim for a loss that its predecessor actually incurred. Old Republic also maintains that the trial court erred in (1) affirming the jury's verdict that "environmental stigma" was a title defect covered by the policy; (2) admitting unreliable expert testimony; and (3) denying its motion for directed verdict to preclude any consideration of diminution of value to an adjoining tract of property that was purchased separately from the tract for which the title insurance policy was initially issued. In Case No. A16A0258, RM Kids contends that the trial court erred in denying its claims for bad-faith damages and prejudgment interest as a matter of law.

For the reasons set forth *infra*, we reverse the trial court's ruling that the date of RM Kids's loss was the date its predecessor-in-interest closed on the subject loan, and, thus, we remand the case for retrial. As to the remaining issues not rendered moot by the remand for retrial, we affirm for the reasons noted *infra*.

2

Construed in favor of the jury's verdict,[1] the evidence shows that the property at the center of this litigation is a 114-acre tract, through which both Hopkins Creek and the Alcovy River run, that is located in Gwinnett County near the City of Dacula and referred to as "Black Hawk Ranch." In the early 1990s, a pumping station near the Black Hawk Ranch, which was owned and operated by Colonial Pipeline Company ("Colonial"), leaked petroleum into the groundwater. Subsequently, some of the petroleum migrated to the groundwater under Black Hawk Ranch. Colonial reported the leak to the Georgia Environmental Protection Division ("EPD"), which then, under a consent order, conducted an environmental assessment and developed a corrective-action plan. Not long thereafter, Colonial acquired Black Hawk Ranch, and, as part of a corrective-action plan, it set up three small wells on the property to monitor the groundwater. In addition, because any pumping of the groundwater could potentially have caused more petroleum to migrate from the subject property, Colonial arranged for the property to be serviced by public water from the county.

After Colonial fully implemented its corrective-action plan, testing of the groundwater indicated reduced contamination such that the EPD allowed Colonial to lower the number of monitoring wells on the property to one, and by 2003, Colonial

---

[1] *See Horton v Hendrix*, 291 Ga. App. 416, 416 (662 SE2d 227) (2008).

3

believed that the property was suitable for sale and development. Indeed, in January 2005, Colonial sold the property to Black Hawk Ranch, LLC. And as part of that sale, Colonial attached "Exhibit C" to the deed, which provided the following:

> In connection with the conveyance of the Property pursuant to this Limited Warranty Deed, Grantor hereby notifies Grantee and its successors and assigns that petroleum contamination, including groundwater and surface water contamination, emanating from Grantor's pipeline facility located adjacent to the Property was discovered in the early 1990s. Grantor has been assessing and remediating such contamination as required by the State of Georgia Environmental Protection Division ("EPD") and has assumed and maintains full responsibility for performing the investigation, remediation and monitoring of such petroleum contamination in accordance with applicable law and the requirements of the EPD; provided, however, groundwater contamination in the deep aquifer remains and will continue to be monitored by Grantor as required by the EPD.

Exhibit C also placed the following four limitations on the use of the property: (1) no use of the groundwater for any purpose whatsoever; (2) an easement reserved by Colonial for access and maintenance of the monitoring well on the property; (3) a right of first refusal for Colonial to reacquire the property in the event the grantee

4

received an offer on the property; and (4) reservation of a 25-foot riparian buffer easement as to Hopkins Creek and the Alcovy River.

Following its purchase of the property, Black Hawk Ranch, LLC successfully petitioned the City of Dacula to annex the parcel and rezone it for high density single-family development. One year later, in 2006, Black Hawk Ranch, LLC sold the property to BBC Partners, LLC. To fund the purchase, BBC entered into a $7,300,000 loan agreement with Peachtree Bank, with the property as security. And although there was some indication that Peachtree Bank was aware of the property's environmental issues, Exhibit C was not included in the chain of title following this conveyance and was not noted in the exceptions to Peachtree Bank's lender's title-insurance policy issued by Old Republic. Under that policy, Old Republic insured Peachtree Bank against loss or damage sustained or incurred by reason of, *inter alia*, "[a]ny defect in or lien or encumbrance on the title"; "[u]nmarketability of the title"; and '[l]ack of access to and from the land[.]" The policy also provided numerous exclusions, including "[d]efects, liens, encumbrances, adverse claims or other matters: [c]reated, suffered, assumed or agreed to by the Insured claimant" or such "resulting in no loss or damage to the insured claimant." Additionally, in defining the extent of Old Republic's liability, the policy provided: "[t]his policy is a contract of

indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described."

In December 2006, BBC purchased a 37-acre parcel on the western side of the Black Hawk Ranch property, known as the Wages Tract, for $1,300,000, and Exhibit C was not included in that chain of title. Shortly thereafter, in April 2007, BBC and Peachtree Bank entered into a new loan for $11,400,000, which was secured by the Wages Tract and Black Hawk Ranch, and which was used to pay off the acquisition loans for both of those parcels of property. In connection with that loan, Old Republic issued the subject lender's title-insurance policy to Peachtree Bank, which, once again, made no mention of the environmental issues or restrictions on the property as outlined in Exhibit C.

In April 2008, RM Kids acquired the $11,400,000 BBC loan from RBC Bank, which was the successor by merger to Peachtree Bank, by means of an allonge and assignment of the security deed. A few months later, while engaging in discussions with BBC about a possible forbearance agreement, RM Kids learned about Exhibit C and the restrictions it imposed upon the property. And believing that title to the property was defective, RM Kids contacted Old Republic in January 2010 and

6

demanded that it address these defects. Old Republic did not respond, and in November 2010, after subsequent demands also went unanswered, RM Kids filed suit against Old Republic, alleging, *inter alia*, breach of contract and bad faith. Later, in December 2012 (and while discovery in the case was still ongoing), RM Kids foreclosed on the property and purchased it at the foreclosure sale for $750,000.

Prior to trial, Old Republic filed a motion for summary judgment, arguing, *inter alia*, that RM Kids's bad-faith claim failed as a matter of law because it had reasonable grounds for denying RM Kids's claim under the policy. Later, Old Republic also filed a motion to exclude RM Kids's expert witness from testifying regarding diminution in value of the property, arguing that the expert's testimony was not based on any reliable methodology. Additionally, Old Republic filed a motion arguing that the trial court should, as a matter of law, rule that the date of RM Kids's loss was the date that it foreclosed on the subject property rather than the date that its predecessor-in-interest, Peachtree Bank, closed on the loan. RM Kids filed responses, and ultimately, in three separate orders, the trial court (1) granted Old Republic's motion for summary judgment as to RM Kids's bad-faith claim, (2) denied Old Republic's motion to exclude the testimony of RM Kids's expert, and (3) denied Old Republic's motion to set the date of RM Kids's loss at the time of the foreclosure,

ruling instead that, as a matter of law, the date of RM Kids's loss for the purpose of measuring damages was the date Peachtree Bank closed on the $11,400,000 loan.

The case then proceeded to trial, and after both parties presented their evidence, Old Republic moved for a directed verdict on several grounds, arguing that if the date of loss was the loan closing date, RM Kids lacked standing; damages, if any, were not liquidated and, thus, not subject to prejudgment interest; the Wages Tract should not be considered with regard to damages because the policy did not apply to that parcel of property; and RM Kids failed to prove that it suffered an actual monetary loss. The trial court granted Old Republic's motion for directed verdict as to whether damages were subject to prejudgment interest, but denied it in all other respects.

At the trial's conclusion, the jury rendered a verdict in favor of RM Kids on its breach-of-contract claim and awarded $7,130,370 in damages. One week later, the trial court issued a judgment affirming the jury's verdict. These cross-appeals follow.

*Case No. A16A02257*

1. Old Republic first contends that the trial court erred in ruling that the date of RM Kids's loss was the date that its predecessor-in-interest, Peachtree Bank, closed on the subject loan rather than the date RM Kids foreclosed on the subject property. We agree and, thus, reverse the trial court's ruling.

8

In Georgia, insurance contracts are "governed by the rules of construction applicable to other contracts, and words in the policy must be given their usual and common signification and customary meaning."[2] It is, of course, well established that the hallmark of contract construction is to "ascertain the intention of the parties."[3] And obviously, when the language of an insurance policy defining the extent of an insurer's liability is "unambiguous and capable of but one reasonable construction, the courts must expound the contract as made by the parties."[4] Importantly, the proper construction of a contract, and whether the contract is ambiguous, are "questions of law for the court to decide."[5] With these guiding principles in mind, we turn now to Old Republic's specific claims of error.

---

[2] *Roberson v. Leone*, 315 Ga. App. 459, 462 (726 SE2d 565) (2012) (punctuation omitted); *accord Turner v. Gateway Ins. Co.*, 290 Ga. App. 737, 739 (660 SE2d 484) (2008).

[3] *Roberson*, 315 Ga. App. at 462 (punctuation omitted); *accord Infinity Gen. Ins. Co. v. Litton*, 308 Ga. App. 497, 500 (2) (707 SE2d 885) (2011).

[4] *Roberson*, 315 Ga. App. at 462 (punctuation omitted); *accord Litton*, 308 Ga. App. at 500 (2).

[5] *Roberson*, 315 Ga. App. at 462 (punctuation omitted); *accord Clayton v. S. Gen. Ins. Co.*, 306 Ga. App. 394, 396 (702 SE2d 446) (2010).

As previously noted, the title insurance policy issued by Old Republic to Peachtree Bank at the time the subject property was acquired by BBC insured the bank against loss or damage sustained or incurred by reason of, *inter alia*, "[a]ny defect in or lien or encumbrance on the title"; "[u]nmarketability of the title;"; and [l]ack of access to and from the land[.]" Additionally, the policy provided that it "is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described." In determining "actual" loss or damage, it is generally held that "for purposes of title insurance, a mortgagee's loss is measured by the extent to which the insured debt is not repaid because the value of the security property is diminished or impaired by outstanding lien encumbrances or title defects covered by title insurance."[6] And although Georgia's appellate courts do not appear to have specifically addressed *when* such loss to a mortgagee or lender *actually occurs*, "a majority of courts from other jurisdictions have held that, in the absence of specific policy language, a title

---

[6] *Couch on Insurance*, § 185.87 (3d ed. 2012).

insurer's liability to a mortgagee should be measured using the foreclosure date,"[7]

reasoning that the foreclosure date is "appropriate because the foreclosure is when the

insured actually incurs a covered loss."[8]

---

[7] *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 759 F3d 427, 432 (III) (5th Cir. 2014); *see also Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F2d 1058, 1063 (II) (1st Cir. 1990) (holding that "a mortgagee-insured's loss cannot be determined unless the note is not repaid and the security for the mortgage proves inadequate"); *Associated Bank, N.A. v. Stewart Title Guar. Co.*, 881 FSupp2d 1058, 1066 (III) (C) (D. Minn. 2012) (holding that an insured mortgagee's loss under a title insurance policy "cannot be measured until the note has not been repaid and the security for the mortgage is shown to be inadequate"); *Marble Bank v. Commonwealth Land Title Ins. Co.*, 914 FSupp 1252, 1254 (E.D. N.C. 1996) (finding that "[s]ince a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss," rather "[o]nly the completion of foreclosure signifies that a lender will not collect on its note"); *Karl v. Commonwealth Land Title Ins. Co.*, 20 CalApp4th 972, 983-84 (IV) (Cal. App. 1993) (holding that "the earliest a loss can be claimed on a lender's [title insurance] policy is at the time of completion of foreclosure"); *Blackhawk Prod. Credit Assoc. v. Chicago Title Ins. Co.*, 423 NW2d 521, 525 (Wis. 1988) (holding that "[a] mortgagee's loss cannot be measured unless the underlying debt is not repaid and the security for the mortgage proves inadequate"); *Green v. Evesham Corp.*, 430 A2d 944, 946 (N.J. App. 1981) (same); Joyce D. Palomar, 1 TITLE INS. LAW § 10:16 (2013–14 ed.); Christopher B. Frantze, *Equity Income Partners LP v. Chicago Title Insurance Co. and Recovery Under a Lender's Title Insurance Policy in a Falling Real Estate Market*, 48 Real Prop. Tr. & Est. L.J. 391, 396 (2013).

[8] *First Am. Bank*, 759 F3d at 432 (III); *see also Marble Bank,* 914 FSupp at 1254 ("In the court's view, plaintiff did not suffer a loss until it foreclosed on the project. Since a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss. Only the completion of foreclosure signifies that a lender will not collect on its note." (citation omitted)).

11

Upon consideration of this authority, we find the majority view to be persuasive and applicable here in Georgia. Indeed, while not explicitly adopted, this Court *has* previously acknowledged that "[c]onsideration of the amount obtained by a mortgagee through foreclosure of collateral is a recognized method for determining whether the mortgagee has suffered an actual monetary loss covered by the policy."[9] Furthermore, as noted *supra*, the policy issued by Old Republic in this matter is one of indemnity, and as a result, it "provides for indemnity only to the extent that the insured's security is impaired and to the extent of the resulting loss that it sustains."[10] It does not, however, "guarantee either that the mortgaged premises are worth the amount of the mortgage or that the mortgage debt will be paid."[11]

---

[9] *Doss & Assoc. v. First Am. Title Ins. Co., Inc.*, 325 Ga. App. 448, 463 (4) n.15 (754 SE2d 85) (2013).

[10] *First Am. Bank*, 759 F3d at 433 (III) (punctuation omitted); *see also Gibraltar Sav. v. Commonwealth Land Title Ins. Co.,* 905 F2d 1203, 1205 (8th Cir. 1990); *Diversified Mortg. Inv. v. U.S. Life Title Ins. Co. of N.Y.*, 544 F2d 571, 574 n. 2 (2d Cir. 1976).

[11] *First Am. Bank*, 759 F3d at 433 (III) (punctuation omitted); *see also Blackhawk Prod. Credit*, 423 NW2d at 525.

Nevertheless, citing *U.S. Life Title Ins. Co. of Dallas v. Hutsell*,[12] RM Kids argues that Georgia law has established that a loss under a title-insurance policy is measured as of the closing date. But as RM Kids concedes in its appellate brief, this case involved determining the date of loss under an *owner's* title-insurance policy rather than a *lender's* policy.[13] Critically, defining and measuring actual loss "under a title insurance policy is not the same for the owner who has title to property, and a mortgagee who holds only a security interest in the borrower's title."[14] This is because "[t]he fee interest of an owner is immediately diminished by the presence of lien since resale value will always reflect the cost of removing the lien[,] but, as noted *supra*, "[a] mortgagee's loss cannot be measured *unless the underlying debt is not repaid and the security for the mortgage proves inadequate*."[15] RM Kids attempts to blur this distinction by asserting that, under Georgia law, a deed to secure debt conveys outright legal title to a lender until the secured debt is repaid,[16] and, thus, a lender and

---

[12] 164 Ga. App. 443 (296 SE2d 760) (1982).

[13] *See id.* at 443-44 (noting that owner insisted on a title-insurance policy and sued for breach of same).

[14] *Blackhawk Prod. Credit*, 423 NW2d at 525 (punctuation omitted).

[15] *Id.* (emphasis supplied).

[16] *See* OCGA § 44-14-60.

an owner's interests are identical. But belying this conflation, our Supreme Court has held "[a] security deed, although conveying the legal title, does so for the purpose of security only, and, upon the satisfaction of the obligation which it is given to secure, is automatically extinguished in effect . . . ."[17] Consequently, we do not find RM Kids's argument persuasive, and given the particular circumstances before us, we hold that RM Kids's loss in this matter occurred at the time it foreclosed on the subject property. Accordingly, we reverse the trial court's ruling in this regard, and remand the case for retrial.

2. In its second enumeration of error, Old Republic contends that if the date of the loss was, in fact, the closing date, then the trial court erred in ruling that RM Kids had standing to assert a claim for a loss that Peachtree Bank, and not RM Kids, actually incurred. But given our holding in Division 1, *supra*, this issue is moot and we need not address it.

3. Old Republic also maintains that the trial court erred in affirming the jury's verdict that "environmental stigma" was a title defect covered by the title insurance policy. Specifically, Old Republic argues that although the environmental stigma

---

[17] *Nw. Carpets, Inc. v. First Nat. Bank of Chatsworth*, 280 Ga. 535, 537 (1) (630 SE2d 407) (2006) (punctuation omitted); *accord Trail v. Saunders*, 296 Ga. App. 594, 595 (675 SE2d 514) (2009).

associated with petroleum leakage into the property's groundwater is certainly a physical condition that may diminish the property's value, it does not constitute unmarketability of title or an encumbrance and, thus, is not a defect covered by the policy.[18] Old Republic then further argues that RM Kids failed to present evidence as to how any lien or encumbrance caused damages, but instead only presented evidence as to how the environmental stigma damaged the property and, therefore, it failed to show that it sustained any damages covered by the policy.

However, as RM Kids notes in its appellate brief and as Old Republic concedes, Old Republic did not move for a directed verdict on this specific ground. Consequently, Old Republic is barred from contending on appeal that it is entitled to an adjudication as a matter of law on this issue.[19] Nevertheless, OCGA § 5-6-36 (a) provides that "[t]he entry of judgment on a verdict by the trial court constitutes an

---

[18] *See Chicago Title Ins. Co. v. Investguard, Ltd.*, 215 Ga. App. 121, 122-23 (1) (449 SE2d 681) (1994) (holding that for purposes of title-insurance policy, difference exists between economic lack of marketability, which relates to physical conditions affecting use of property, and title marketability, which relates to defects affecting legally recognized rights and incidents of ownership).

[19] *See Aldworth Co., Inc. v. England*, 281 Ga. 197, 198 (2) (637 SE2d 198) (2006) (noting that under OCGA § 9-11-50, a party is barred from contending on appeal that it was entitled to a directed verdict based on the sufficiency of the evidence to support a claim if the party failed to move for a directed verdict as to that claim at trial).

adjudication by the trial court as to the sufficiency of the evidence to sustain the verdict, affording a basis for review on appeal without further ruling by the trial court." And our Supreme Court has held that this statute "should be interpreted to permit a party to obtain only a new trial on appeal if [it] prevails on a claim that the evidence was insufficient to sustain the verdict, but failed to move for a directed verdict on that ground at trial."[20] But given our holding in Division 1, *supra*, ordering a retrial of this case, we need not further address this issue at this time.

4. Old Republic further argues that the trial court erred in admitting testimony offered by RM Kids's expert witness regarding the diminution of the subject property's value that was unreliable. We disagree.

OCGA § 24-7-702 (b),[21] provides

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence, or to determine a fact in issue,

---

[20] *Id.* at 199 (2).

[21] Old Republic filed its motion to exclude RM Kids's expert's testimony in July 2013, thus Georgia's new Evidence Code applies. *See* Ga. L. 2011, pp. 99, 214, §101. Regardless, because OCGA § 24-7-702 is "substantively identical" to "its predecessor statute, former OCGA § 24-9-67.1, cases decided under the former statute offer useful guidance when analyzing the current version of the statute." *Dempsey v. Gwinnett Hosp. Sys.*, 330 Ga. App. 469, 471 (1) (a) n.3 (765 SE2d 525) (2014) (punctuation omitted).

a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if [t]he testimony is based upon sufficient facts or data, [t]he testimony is the product of reliable principles and methods, and [t]he witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

Of course, the proffering party bears the burden of "presenting evidence of reliability in order to meet the standards of [OCGA § 24-7-702 (b)]."[22] But importantly, the determination of whether a witness is "qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion."[23]

At trial, RM Kids proffered a commercial real estate appraiser, Jeffrey Miller— who has performed thousands of commercial real estate appraisals and has testified as an expert on numerous occasions—to testify as to the diminution of the subject property's value caused by the environmental stigma associated with the petroleum

---

[22] *HNTB Ga., Inc. v. Hamilton-King*, 287 Ga. 641, 646 (2) (697 SE2d 770) (2010) (punctuation omitted).

[23] *Id.* (punctuation omitted); *accord Moore v. Cottrell, Inc.*, 334 Ga. App. 791, 793 (1) (780 SE2d 442) (2015); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (II) (119 SCt. 1167, 143 LE2d 238) (1999).

leak and groundwater contamination. Relying on his inspection of the subject property, experience in the field of appraising property slated for residential development, knowledge of the relevant real estate market, and a modest survey of market participants, Miller opined that potential buyers of homes in a dense residential subdivision—such as the one BBC planned to develop on the subject property—would be "scared off" by the environmental stigma. Miller further opined that the subject property could be developed for large-acreage estate parcels because potential buyers would be less likely to view the environmental issues as a deterrent. Miller did note, however, that developing the property in such a manner would result in a significantly diminished value.

In its pretrial motion and on appeal, Old Republic argues that Miller's expert testimony should have been excluded because it was not based on any reliable data or recognized methodology. But we do not agree that the trial court abused its discretion in admitting Miller's testimony. It is well established that in determining the admissibility of expert testimony, the trial court "acts as a gatekeeper, assessing

both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony."[24] And generally,

> [r]eliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.[25]

Suffice it to say, there are many different kinds of experts and many different kinds of expertise, and, as a result, the test of reliability is "a flexible one, the specific factors neither necessarily nor exclusively applying to all experts in every case."[26]

---

[24] *HNTB Ga., Inc.*, 287 Ga. at 642 (1) (punctuation omitted); *accord Moore*, 334 Ga. App. at 793 (1). *See generally Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579, 597 (IV) (113 SCt. 2786, 125 LE2d 469) (1993) (holding that the trial judge is assigned the task of "ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand").

[25] *HNTB Ga., Inc.*, 287 Ga. at 642 (1) (punctuation omitted); *accord Moore*, 334 Ga. App. at 793 (1).

[26] *HNTB Ga., Inc.*, 287 Ga. at 643 (1) (punctuation omitted); *accord Toler v. Ga. Dep't of Transp.*, 328 Ga. App. 144, 152 (4) (761 SE2d 550) (2014).

Indeed, it is the possession of "special knowledge derived either from experience, study, or both in a field of expertise that makes one an expert."[27]

In this matter, as previously noted, Miller had extensive experience as a commercial real estate appraiser and had inspected the subject property and relied upon both, as well as his knowledge of the market, in opining that the environmental stigma implied by Exhibit C diminished the value of the property by making it less viable for development as a high-density residential subdivision. And while Old Republic claims that Miller's methodology in support of this opinion could not be tested, "the relevant reliability concerns may focus upon personal knowledge or experience."[28] Thus, so long as an expert witness is "properly qualified in the field in which he offers testimony, and the facts relied upon are within the bounds of the evidence, whether there is sufficient knowledge upon which to base an opinion goes to the weight and credibility of the testimony, not its admissibility."[29] Furthermore, it is worth noting that

---

[27] *Brady v. Elevator Specialists, Inc.*, 287 Ga. App. 304, 306 (1) (653 SE2d 59) (2007) (punctuation omitted).

[28] *Id.* at 307 (punctuation omitted).

[29] *Id.* (punctuation omitted).

*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience. Whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.[30]

Given these particular circumstances, we simply cannot conclude that the trial court abused its discretion in finding Miller's testimony admissible.[31]

5. Finally, Old Republic contends that the trial court erred in denying its motion for directed verdict to preclude any consideration of diminution of value to the Wages Tract in light of the fact that it was purchased separately from the Black Hawk Ranch property, for which the title-insurance policy actually issued. Again, we disagree.

It is axiomatic that on appeal from the denial of a motion for a directed verdict or a motion for j.n.o.v., we construe the evidence "in the light most favorable to the

---

[30] *Levine v. Suntrust Robinson Humphrey*, 321 Ga. App. 268, 278 (4) (b) (740 SE2d 672) (2013) (punctuation omitted).

[31] *See Brady*, 287 Ga. App. at 306-07 (1) (holding that trial court did not abuse its discretion in admitting expert's opinion, which was based primarily on his own experience in the field).

party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict."[32] And because jurors are the sole and exclusive judges of the weight and credit given to the evidence, we must "construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict."[33] Nevertheless, we review questions of law *de novo*.[34] With these guiding principles in mind, we will now consider this claim of error.

At trial, RM Kids presented evidence that BBC intended to develop the Black Hawk Ranch and Wages properties as a single high-density residential subdivision and, consequently, both properties were pledged as security for the $11,400,000 development loan. RM Kids presented additional evidence indicating that the City of Dacula approved development of the combined 151 acres as a single subdivision. Furthermore, RM Kids presented evidence that in connection with the $11,400,000 development loan, which as previously noted was used to pay off the separate

---

[32] *Atlanta Emergency Serv., LLC v. Clark*, 328 Ga. App. 9, 11 (1) (761 SE2d 437) (2014) (punctuation omitted).

[33] *Id.* (punctuation omitted).

[34] *See id.*

acquisition loans for both of those parcels of property, Old Republic issued *one* lender's title-insurance policy covering the combined 151 acres. In addition, RM Kids's expert testified that the value of the entire development, including the Wages Tract, was diminished by the restrictions and encumbrances outlined in Exhibit C. And while Old Republic presented evidence disputing the claim that the Wages Tract suffered any damage related to the alleged title defects, there was, nevertheless, some evidence to support the jury's verdict in this regard. Accordingly, the trial court did not err in denying Old Republic's motion for directed verdict as to this issue.[35]

*Case No. A16A0258*

6. In its cross-appeal, RM Kids first contends that the trial court erred in granting Old Republic's motion for summary judgment as to RM Kids's allegation of bad faith refusal to pay under OCGA § 33-4-6. We disagree.

It is well established that summary judgment is proper only when "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter

---

[35] *See id.* at 11-12 (1) (holding that some evidence was presented to support the jury's verdict that defendant breached contract, and, therefore, trial court did not err in denying defendant's motion for directed verdict or j.n.o.v.); *Certain Underwriters at Lloyd's of London v. Rucker Constr., Inc.*, 285 Ga. App. 844, 848-50 (2) (648 SE2d 170) (2007) (same). *Cf. Hutsell*, 164 Ga. App. at 446 (1) (holding that whether title policy covered damages of diminished value caused by survey defect was jury issue, and, thus, trial court did not err in denying insurer's motion for directed verdict).

of law."[36] Thus, when ruling upon a motion for summary judgment, the opposing party "must be given the benefit of all reasonable doubt, and the evidence and all inferences and conclusions therefrom must be construed most favorably toward the party opposing the motion."[37] Accordingly, when we review the grant or denial of summary judgment, we "conduct a *de novo* review of the law and evidence."[38]

OCGA § 33-4-6 (a), in relevant part, provides that

in the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer. . . .

Importantly, because OCGA § 33-4-6 (a) provides for a penalty, "it must be strictly construed."[39] Generally, the question of good or bad faith is for the jury, but "when

---

[36] *Hall v. Prosero, Inc.*, 333 Ga. App. 454, 454 (774 SE2d 216) (2015) (punctuation omitted).

[37] *Id.* at 454-55 (punctuation omitted).

[38] *Id.* at 455.

[39] *Doss & Assoc.*, 325 Ga. App. at 461 (4).

there is no evidence of unfounded reason for the nonpayment, or if the issue of liability is close, the court should disallow imposition of bad faith penalties."[40]

As noted in OCGA § 33-4-6 (a), in order to prevail on a claim for an insurer's bad faith, the insured must prove: "(1) that the claim is covered under the policy, (2) that a demand for payment was made against the insurer within 60 days prior to filing suit, and (3) that the insurer's failure to pay was motivated by bad faith."[41] Bad-faith penalties are not authorized, however, when "the insurance company has any reasonable ground to contest the claim and [when] there is a disputed question of fact."[42] Moreover, the mere fact of nonpayment is "not evidence of bad faith, nor is any burden thereby cast on the insurer to prove good faith."[43] Rather, bad faith is shown by "evidence that under *the terms of the policy* under which the demand is

---

[40] *Int'l Indem. Co. v. Collins*, 258 Ga. 236, 238 (2) (367 SE2d 786) (1988).

[41] *Lawyers Title Ins. Corp. v. Griffin*, 302 Ga. App. 726, 730 (2) (b) (691 SE2d 633) (2010) (punctuation omitted).

[42] *Id.* at 731 (2) (b) (punctuation omitted).

[43] *Fla. Int'l Indem. Co. v. Osgood*, 233 Ga. App. 111, 115 (3) (503 SE2d 371) (1998) (punctuation omitted).

made and under the facts surrounding the response to that demand, the insurer had no 'good cause' for resisting and delaying payment."[44]

Here, genuine issues of material fact exist as to whether Peachtree Bank was aware of Exhibit C prior to closing and, thus, whether RM Kids's claim was excluded under the insurance policy as an "assumed" title defect. Additionally, Old Republic contends that RM Kids's claim was excluded because it suffered "no loss or damage." Furthermore, as discussed at length in Division 1, *supra*, Old Republic contends that even if RM Kids has a valid title defect claim, a bona fide dispute exists as to whether the date of any loss, for the purpose of measuring damages, was the date that Peachtree Bank closed on the subject loan rather than the date RM Kids foreclosed on the subject property. And indeed, as we held in Division 1, Old Republic's contention in this regard was perfectly reasonable. In fact, it proved to be correct. Given these particular circumstances, Old Republic had a reasonable basis to refuse

---

[44] *Griffin*, 302 Ga. App. at 731 (2) (b) (punctuation omitted).

RM Kids's demand.[45] And as a result, the trial court did not err in granting Old Republic's motion for summary judgment on this issue.

7. RM Kids further contends that the trial court erred in granting Old Republic's motion for directed verdict as to RM Kids's claim for prejudgment interest under OCGA § 7-4-15, arguing that whether or not damages were liquidated was an issue for the jury. Again, we disagree.

OCGA § 7-4-15 provides, in relevant part, that "[a]ll liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand." Under this code section, "prejudgment interest—which flows automatically from a liquidated

---

[45] *See Roland v. Ga. Farm Bureau Mut. Ins. Co.*, 265 Ga. 776, 778 (2) (462 SE2d 623) (1995) (affirming trial court's directed verdict in favor of insured on coverage claim but, nonetheless, also affirming court's directed verdict in favor of insurer on insured's bad-faith claim in light of the fact that insured's coverage, despite ultimately succeeding, was based on a doubtful question of law); *Griffin*, 302 Ga. App. at 731 (2) (b) (holding that because insurer's nonpayment was based on contention that insured did not have a covered loss under the policy because the value of the property was the same regardless of whether it was serviced by an easement, nonpayment was reasonable and not subject to a bad-faith claim); *Assurance Co. of Am. v. BBB Serv. Co., Inc.*, 259 Ga. App. 54, 58 (2) (576 SE2d 38) (2002) (holding that trial court did not err in granting summary judgment in favor of insurer on bad-faith claim because reasonable dispute existed as to whether policy covered insured's claim).

demand—is to be awarded upon a judgment for a liquidated amount."[46] But importantly, a demand is liquidated when "the sum owed is fixed and certain, meaning there is no bona fide controversy over the amount."[47]

Here, even after the trial court's erroneous ruling establishing the closing on the loan as the date that Peachtree Bank—and RM Kids's as the bank's successor-in-interest—suffered a loss under the title insurance policy, the parties vigorously disputed at trial the amount of damages, if any, that RM Kids sustained due to the title defect. Indeed, the primary focus of the trial, because of its implications as to both liability and damages, was the dispute as to whether and to what extent the alleged title defects, indicated by Exhibit C, diminished the subject property's market value. And both this Court and the Supreme Court of Georgia have taken the position that "when on entering upon trial the insurer disputes the amount of loss claimed by the insured, interest on the amount recovered begins *only* after entry of judgment."[48]

---

[46] *Estate of Callaway v. Garner*, 297 Ga. 52, 54 (2) (772 SE2d 668) (2015) (punctuation omitted).

[47] *Id.* (punctuation omitted); *accord Those Certain Underwriters at Lloyds, London v. DTI Logistics, Inc.*, 300 Ga. App. 715, 722 (4) (686 SE2d 333) (2009); *Int'l Indem. Co. v. Terrell*, 178 Ga. App. 570, 570 (2) (344 SE2d 239) (1986).

[48] *Pacific Ins. Co. of N.Y. v. R.L. Kimsey Cotton Co.*, 114 Ga. App. 411, 416-17 (4) (151 SE2d 541) (1966) (emphasis supplied); *see Braner v. S. Trust Ins. Co.*, 255

28

Accordingly, the trial court did not err in granting Old Republic's motion for directed verdict as to RM Kids's claim for prejudgment interest.

In summary, and for the foregoing reasons, in Case No. A16A0257, we conclude that the date for the purpose of measuring any loss by RM Kids was the date it foreclosed on the subject property, and we reverse the trial court's ruling that the date of the loss was the date that Peachtree Bank closed on the subject loan. And because that erroneous ruling entirely governed the manner in which the case was tried, we must remand the case for retrial. Based on our ruling, Old Republic's contention that RM Kids lacked standing is moot, and we need not address its contention that the evidence was insufficient to support the jury's verdict that the "environmental stigma" constituted a title defect covered by the insurance policy. However, we affirm the trial court's admission of RM Kids's expert's testimony and its denial of Old Republic's motion for directed verdict regarding consideration of

Ga. 117, 119 (1) (335 SE2d 547) (1985) (holding that in a suit on a property damage insurance policy in which liability is not disputed but in which the amount of damage is disputed, the amount is unliquidated); *Firemen's Ins. Co. v. Oliver*, 182 Ga. 212, 212 (184 SE 858) (1936) (holding that in a dispute between insurer and insured, in which the insurer admitted liability but disputed the amount of damages, "[i]t was only after entry of a judgment upon that verdict that the claim became liquidated"). *Cf. DTI Logistics, Inc.*, 300 Ga. App. at 722-23 (4) (holding that insured's demand to insurer was liquidated when insurer did not point to any evidence at trial in support of its contention that damages were disputed).

29

any diminution of value to the Wages tract. Additionally, in Case No. A16A0258, we affirm the trial court's grant of summary judgment in favor of Old Republic as to RM Kids's bad-faith claim and its grant of a directed verdict in favor of Old Republic as to RM Kids's prejudgment interest claim.

*Judgment in Case No. A16A0257 affirmed in part and reversed in part, and case remanded. Judgment in Case No. A16A0258 affirmed and case remanded. Phipps, P. J., and Peterson, J., concur*.