**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 17, 2019**

# In the Court of Appeals of Georgia

A19A0971. OLD REPUBLIC NATIONAL TITLE INSURANCE
      COMPANY v. RM KIDS, LLC.

MARKLE, Judge.

In the second appearance of this case before this Court, Old Republic National Title Insurance Company ("Old Republic") appeals from the denial of its motion for directed verdict in a trial for breach of contract, in which the jury found in favor of RM Kids and awarded damages in the amount of $4.2 million. See *Old Republic Nat. Title Ins. Co. v. RM Kids, LLC.*, 337 Ga. App. 638 (788 SE2d 542) (2016). On appeal, Old Republic argues that there was no defect in title that would trigger coverage under the title insurance policy, and that, in any event, RM Kids suffered no damages. After a thorough review of the evidence, and with the benefit of oral argument, we conclude that the trial court properly denied the motion for directed verdict because

there was a defect in the title that triggered coverage, and RM Kids proffered some evidence from which the jury could determine damages.

> [O]n appeal from the denial of a motion for a directed verdict or a motion for j.n.o.v., we construe the evidence in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict. And because jurors are the sole and exclusive judges of the weight and credit given to the evidence, we must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. Nevertheless, we review questions of law de novo.

(Citations and punctuation omitted.) *Old Republic Nat. Title Ins. Co.*, 337 Ga. App. at 648 (5). Moreover,

> [t]he direction of a verdict is proper only where there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. When there is opinion evidence, circumstantial evidence, presumptions of fact, or evidence subject to more than one reasonable construction, the appellate courts shall carefully scrutinize the grant of a directed verdict, because such evidence may be construed as providing the "any evidence" creating a jury question.

2

(Citation omitted.) *Canton Plaza, Inc. v. Regions Bank, Inc.*, 315 Ga. App. 303, 303-304 (732 SE2d 449) (2012); see also OCGA § 9-11-50 (a).

The underlying facts are undisputed and are set out in our prior opinion. See *Old Republic Nat. Title Ins. Co.*, 337 Ga. App. at 638-641. In summary, in the early 1990's, one of Colonial Pipeline Company's ("Colonial") pumping stations leaked petroleum into the ground water on an area of land known as "Black Hawk Ranch" near Dacula, Georgia. Pursuant to a consent order between Colonial and the Georgia Environmental Protection Division, Colonial acquired the Black Hawk Ranch property and began remediation and monitoring.

In 2005, after reducing the contamination, Colonial sold the property to Black Hawk Ranch, LLC, pursuant to a limited warranty deed. Attached to the deed was "Exhibit C," which provided the following:

> In connection with the conveyance of the Property pursuant to this Limited Warranty Deed, Grantor hereby notifies Grantee and its successors and assigns that petroleum contamination, including groundwater and surface water contamination, emanating from Grantor's pipeline facility located adjacent to the Property was discovered in the early 1990s. Grantor has been assessing and remediating such contamination as required by the State of Georgia Environmental Protection Division ("EPD") and has assumed and maintains full responsibility for performing the investigation,

3

remediation and monitoring of such petroleum contamination in accordance with applicable law and the requirements of the EPD; provided, however, groundwater contamination in the deep aquifer remains and will continue to be monitored by Grantor as required by the EPD.

Exhibit C also placed the following four limitations on the use of the property: (1) no use of the groundwater for any purpose whatsoever; (2) an easement reserved by Colonial for access and maintenance of the monitoring well on the property; (3) a right of first refusal for Colonial to reacquire the property in the event the grantee received an offer on the property; and (4) reservation of a 25-foot riparian buffer easement as to Hopkins Creek and the Alcovy River.[1] The certificate of title included reference to the easement and restrictions as identified in Exhibit C.

The property was later rezoned for residential development, and Black Hawk Ranch sold the property to BBC Partners, LLC ("BBC Partners"). Exhibit C was omitted from the chain of title for this sale. Old Republic issued the title insurance policy, which covered loss or damage sustained or incurred by reason of, inter alia, "[a]ny defect in or lien or encumbrance on the title" or "[u]nmarketability of the title." The policy also listed numerous exclusions, including for defects "resulting in no loss

---

[1] It is undisputed that Colonial never exercised its right of first refusal.

or damage to the insured claimant." *Old Republic Nat. Title Ins. Co.*, 337 Ga. App. at 640.

In 2006, BBC Partners purchased the adjacent property, and, again, Exhibit C was not included in the chain of title at closing. Id. Old Republic also issued a policy insuring title in connection with the loan for this purchase. Id.

In 2008, RM Kids purchased the BBC Partners's loan from a lender, and learned of Exhibit C shortly thereafter. When BBC Partners subsequently defaulted on the loan in 2012, RM Kids purchased the property in foreclosure. Following unsuccessful attempts to have Old Republic address whether the omission of Exhibit C was a title defect triggering coverage under the title insurance policy, RM Kids filed the instant suit, alleging, as is relevant to this appeal, breach of contract.

The case proceeded to trial and a jury found in favor of RM Kids. Old Republic appealed, and we reversed in part, and remanded the case for a new trial. See *Old Republic Nat. Title Ins. Co.*, 337 Ga. App. at 644 (1).

A second trial was held in 2018.[2] The title agent for Old Republic admitted in his testimony that Exhibit C should have been included in the coverage exceptions,

_____

[2] By the time of the second trial, RM Kids had defaulted on a loan for which the property was collateral, and the loan had gone into foreclosure. As a result, RM Kids no longer owns the property.

5

but was erroneously omitted. Both sides submitted expert testimony as to the value of the property with and without the restrictions imposed in Exhibit C. At the close of the RM Kids's case and again at the close of all the evidence, Old Republic moved for a directed verdict, arguing that the alleged loss was not covered by the title insurance policy and that RM Kids had not established damages. The trial court denied both motions. The jury again found in favor of RM Kids, and awarded damages in the amount of $4.2 million. This appeal followed.

In its sole enumeration of error, Old Republic argues that the trial court erred in denying its motion for directed verdict because the alleged loss at issue was not a title defect, and thus it was not covered by the policy. It further contends that RM Kids has suffered no damages apart from the stigma associated with the earlier petroleum spill, which would not be covered under the policy because it is unrelated to transferability of title or the ability to develop the property. We disagree with both arguments and address each in turn.

1. Whether the omission of Exhibit C triggered coverage under the policy

We begin with Old Republic's claim that there was no defect in title that would have triggered coverage under the policy.

6

"A contract of title insurance is an agreement whereby the insurer, for a valuable consideration, agrees to indemnify the assured in a specified amount against loss through defects of title to real estate, wherein the latter has an interest, either as purchaser or otherwise[.]" *Beaullieu v. Atlanta Title & Trust Co.*, 60 Ga. App. 400, 404 (4 SE2d 78) (1939); see also OCGA § 33-7-8 (2018). "Typically, title insurance protects a purchaser or mortgagee against defects in or encumbrances on title which are in existence at the time the insured takes his title." (Citation omitted.) *Chicago Title Ins. Co. v. C&S Nat. Bank*, 821 FSupp 1492, 1494 (II) (N.D. Ga. 1993); see also Couch on Insurance § 159:5 (3d ed. 2019). Title insurance, like other types of insurance policies, are contracts, the construction and interpretation of which involve questions of law for the court. *Geiger v. Ga. Farm Bureau Mut. Ins. Co.*, 305 Ga. App. 399, 400 (1) (a) (699 SE2d 571) (2010).

> [T]he parties to an insurance policy are bound by its plain and unambiguous terms. Thus, when faced with a conflict over coverage, a trial court must first determine, as a matter of law, whether the relevant policy language is ambiguous. A policy which is susceptible to two reasonable meanings is not ambiguous if the trial court can resolve the conflicting interpretations by applying the rules of contract construction. We consider the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other. Any ambiguities in the contract are strictly construed against the insurer and

7

insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible. A word or phrase is ambiguous when it is of uncertain meaning and may be fairly understood in more ways than one.

(Citations and punctuation omitted.) Id. at 400-401 (1) (a).

In determining whether the policy covered the omission of Exhibit C here, we first look to the text of the policy, giving words their "usual and common" meaning. *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 719 (784 SE2d 422) (2016); see also OCGA § 13-2-2 (2). We also read the policy "as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." (Citation omitted.) *Smith*, 298 Ga. at 719. Importantly, "exceptions and exclusions to coverage must be narrowly and strictly construed against the insurer and forgivingly construed in favor of the insured to afford coverage." (Citation and punctuation omitted.) *Auto-Owners Ins. Co. v. Neisler*, 334 Ga. App. 284, 287 (1) (779 SE2d 55) (2015). Moreover, "an insurer seeking to defeat a claim based on a policy exclusion has the burden of proving that the exclusion is applicable[.]" (Citation and punctuation omitted.) *Dolan v. Auto Owners Ins. Co.*, 333 Ga. App. 601, 604 (773 SE2d 789) (2015).

Given our case law, the rules of contract interpretation, and our standard of review, we cannot say, *as a matter of law*, that the restrictions and easements on the

8

property were not "defects" or "encumbrances" in the title. To the extent that these terms are ambiguous because they are not defined in the policy, we turn to our rules of contract interpretation.

Here, reading the policy using ordinary language, coverage extended to "any defect in or lien or encumbrance on the title" and "unmarketability of the title." Generally, an easement is an "encumbrance" that is a defect on the title. See *Beaullieu*, 60 Ga. App. at 404; see also Couch on Insurance § 159:32 (3d ed. 2019). Moreover, encumbrances are defects that are separate and distinct from unmarketability because the policy uses both "defect in or lien or encumbrance" and "[m]arketability of the title," as alternate methods to trigger coverage. To consider marketability the same as an encumbrance would make the language superfluous. See *Stewart Title Guaranty Co. v. Greenlands Realty, LLC*, 58 FSupp2d 370, 382 (III) (A) (1) (D.N.J. 1999); see also Couch on Insurance § 159:5 (3d ed. 2019). Indeed, as Old Republic's counsel acknowledged in its reply brief and at oral argument before this Court, an easement can be a title defect.

Moreover, as we explained in our prior opinion, where the facts of the case raise a question of coverage, the policy is ambiguous, and the decision rests with the jury. See *Old Republic Title Ins. Co.*, 337 Ga. App. at 649 (5) & n.35. Thus, any

9

ambiguity in the language and definition of "defect" or "encumbrance" was for the jury to resolve. Here, RM Kids submitted expert testimony of a real estate attorney who opined that easements and encumbrances on a property were title defects and if not listed on the title insurance policy would be covered. He further testified that Exhibit C was, in fact, a title defect. This evidence was sufficient for the jury to conclude that the restrictions and easements were title defects and were covered by the policy.[3]

Old Republic's reliance on *Chicago Title Insurance Company v. Investguard, Ltd.*, 215 Ga. App. 121 (449 SE2d 681) (1994), does not alter our analysis. In that case, the property was located in a flood plain, and the purchaser argued that this defect rendered its title to the property unmarketable. Id. at 121. This Court held that

---

[3] Admittedly, RM Kids knew of the defect when it purchased the property at the foreclosure. But that does not preclude recovery under the policy. The parties agreed that RM Kids did not have knowledge of Exhibit C at the time it purchased the loan, and Old Republic stipulated that it was not arguing notice. Additionally, RM Kids would not be deemed to have constructive knowledge of the easements contained in Exhibit C at the time it acquired the loan because it received a copy of the security deed and assignment of security interests that omitted that exhibit rather than a copy of the limited warranty deed. Compare *Security Union Title Ins. Co. v. RC Acres, Inc.*, 269 Ga. App. 359, 361 (1) (604 SE2d 547) (2004) ("When an easement is properly recorded of public record, the world has constructive notice of such easement whether or not they have actual notice."). By the time RM Kids learned of the omitted exhibit, it already owned the loan and had no recourse until the foreclosure sale in 2012.

10

defects in the physical condition of property, such as its location in a flood plain, do not constitute a title defect. Id. at 123 (1). But the instant case is distinguishable. First, the alleged defect in *Investguard* was not omitted from the chain of title as it was here. Additionally, an easement is an "encumbrance" on the property and not merely a "physical defect." Moreover, in the instant case, RM Kids has not invoked the coverage provision regarding unmarketability of title; rather, the claim is that the property is subject to these undisclosed encumbrances that rendered the title defective.

Old Republic's argument conflates the concepts of marketability of title and economic marketability.

> While title "defect" and title "marketability" are both used to describe the peril against which title insurance offers protection, it is important to understand that only that decreased marketability which stems from the condition of title is within title insurance. The fact that a given property suffers from "economic" lack of marketability, which relates to physical conditions affecting the use of the property or other nontitle matters, is not relevant to title insurance coverage. In essence, defects which merely diminish the value of the property, as opposed to defects which adversely affect a clear title to the property, will not render title unmarketable within the meaning and coverage of a policy insuring against unmarketable title. This is often expressed by the principle that

11

one can hold perfect title to land that is valueless and one can have "marketable title" to land while the land itself is unmarketable.

(Citations and footnotes omitted.) Couch on Insurance § 159:7 (3d ed. 2019). Because the basis of RM Kids's claim was not marketability of title, Old Republic's argument that the property could still be bought and sold is misplaced. This was not a case involving a simple defect in the physical condition of the property; it was an encumbrance on the property in the form of a restriction on use and the existence of easements, which were omitted from the chain of title and which, as Old Republic acknowledged, can be title defects. In any event, we note that the measure of damages per the terms of the contract is the difference between the value of the land with and without the defect. We fail to see how the economic marketability of the land as encumbered with these defects in title would not be a factor to consider in determining value.

The real crux of Old Republic's claim is that the alleged defect resulted in no damages and, therefore, is expressly excluded from coverage by the policy. But that is a separate and distinct question from whether the defect triggered coverage. Our analysis is dictated by the procedural posture of this case and by our standard of review following the denial of a motion for directed verdict. In this posture, we

12

cannot say as a matter of law that the encumbrances in Exhibit C were not title defects. Rather, on this record, the jury was authorized to find that the easements and use restrictions constituted title defects that would trigger coverage under the policy.

2. Damages

Having concluded that the restrictions placed on the property under Exhibit C were defects in title, we next turn to whether RM Kids has proved its damages and whether Old Republic met its burden to show the exclusion applied. With regard to the application of a policy exclusion, we must narrowly and strictly construe the exclusion against Old Republic and in favor of coverage. *Neisler*, 334 Ga. App. at 287 (1). As to whether RM Kids sufficiently established its damages, we are mindful of our "any evidence" standard of review, and our review of the record demonstrates that there was evidence from which a jury could find damages.

Under the terms of the policy, damages are measured by "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

To support its claim of damages, RM Kids submitted an appraisal showing the value of the property with and without Exhibit C. According to its appraiser, the value

of the property without Exhibit C was $6 million.[4] He explained that the best use of the property without the restrictions was to develop a subdivision with about 336 homes. When he included the easements and restrictions listed in Exhibit C, the value of the property decreased to $680,000 and was best suited for use as four to six large estate lots. He explained that notice of the contamination, as well as the restrictions on groundwater use and the easements were all viewed negatively and would decrease the property's value. As part of the appraisal, the expert spoke with brokers, lenders, and agents and each one stated that the restrictions contained in Exhibit C would affect the ability to develop the land as well as to obtain a loan for any development. He opined that a home buyer was unlikely to "overlook" the restrictions and would simply purchase a competing property instead.

RM Kids' owner testified that he would not have purchased the loan had he known about Exhibit C, that BBC Partners defaulted on the loan after RM Kids purchased it because of the title defect, and that attempts to sell the land after learning about Exhibit C were unsuccessful. He further testified that the encumbrances on the

---

[4] Consistent with this Court's conclusion in *Old Republic Title Ins. Co*, 337 Ga. App. at 641 (1), the appraiser based his valuation as of the date RM Kids foreclosed on the property. See also *Beaullieu*, 60 Ga. App. at 404.

property – the limitations on use of groundwater and the easements – were title defects that themselves caused the property to lose value.

The closing loan officer testified that she likely would not have closed the loan had she known about Exhibit C because it would impair the ability to develop the property. The closing attorney explained that, when his legal assistant was preparing the paperwork to close the loan, she mistakenly removed all of the items listed in Exhibit C instead of only removing the right of first refusal;[5] thus, Exhibit C was omitted from the closing documents in its entirety.

Old Republic submitted its own expert, who opined that the retrospective market value of the property with or without Exhibit C was $1,910,000, and that RM Kids's expert appraiser had overvalued the property. He explained that the value of the property decreased due in large part to the economic recession, and that the restrictions in Exhibit C would not have impacted the value of the property. In reaching this conclusion, he noted that Black Hawk Ranch LLC and the subsequent buyer were both aware of Exhibit C at the time of the sales, and there did not appear to be any impact on the sale or price of the property at that time.

_____

[5] The closing attorney further testified that Colonial's right of first refusal contained in Exhibit C had terminated. Therefore, we do not consider whether this restriction had any impact on damages.

15

It was for the jury to evaluate this testimony and make a determination of damages. Although the stigma from the contamination may have played a role in the jury's verdict, we look only to see whether there was "any" evidence to support the jury's findings. *Canton Plaza, Inc.*, 315 Ga. App. at 303-304. Given the specific expert testimony that the use restrictions and easements contained in Exhibit C reduced the value of the property, there was evidence from which the jury could conclude there were damages flowing from the title defects.

Accordingly, we conclude that the easements and restrictions constituted defects in title that are covered by the policy, and there was sufficient evidence to establish damages. The trial court properly denied the motion for directed verdict.

*Judgment affirmed. Doyle, P. J., and Coomer, J., concur*.