A03A2387. COX et al. v. CITY OF ATLANTA et al.

(596 SE2d 785)

PHIPPS, Judge.

Eugene Cox, Otrina Cox, and M. Ray Baker, d/b/a EOC3 Associates sued the City of Atlanta, Mayor Bill Campbell, Chief of Police Beverly Harvard, Deputy Chief Bobby J. Rocker, and Major William Gordon in their individual and official capacities. The crux of their complaint was that the named defendants had "intentionally and wrongfully induced the [Atlanta] Braves not to enter into or continue a business relationship with Plaintiffs, causing them financial injury." In a lengthy order, the trial court entered summary judgment against EOC3 on its sole claim of tortious interference with business relations.[1] In reaching that resolution, the court listed multiple reasons for its decision. Eugene Cox, Otrina Cox, and M. Ray Baker (collectively EOC3) filed this appeal. For the reasons that follow, we affirm.

When viewed in the light most favorable to the nonmovants, the evidence shows that prior to the 1997 baseball season, the Atlanta Braves played their home games at the Atlanta-Fulton County Stadium. The Atlanta-Fulton County Recreation Authority hired off-duty officers of the Atlanta Police Department (APD) to provide security at the stadium and supplemented those officers with Braves' security personnel. By long-standing practice, on-duty APD officers performed traffic control duties for Braves' baseball games. When the 1996 Olympics concluded, the Olympic stadium was retrofitted for baseball and renamed Turner Field. By negotiating a new agreement, the Braves obtained control over the operation and management of the facility, including security inside Turner Field.

In January 1997, the Braves issued a Request for Proposals (RFP) for inside security services at Turner Field for the 1997 baseball season. The RFP expressed the Braves' clear preference to engage a contractor "to provide off-duty uniformed Atlanta Police Department ('APD') officers for the performance of security and

---

[1] The trial court had already dismissed the claims against Campbell in his individual capacity and was treating the claims against the remaining defendants in their official capacities as the equivalent of claims against the City. Appellants concede in their brief, however, that they do not appeal the grant of summary judgment to Gordon.

police-related duties in the interior, concourse, plazas and parking facilities at Turner Field." The RFP explicitly stated that:

> Contractor will furnish the Atlanta Braves with uniformed APD police officers for the purpose of providing security, monitoring and patrolling, maintaining order and decorum, enforcing Atlanta Braves' policies, and enforcing all applicable Federal, State, Fulton County and City of Atlanta laws, statutes, regulations and ordinances at the Stadium.

Larry Bowman, the director of stadium operations and security for the Braves, testified that APD officers were preferred because Turner Field lies within the corporate limits of the City.

Eugene Cox, a senior patrol officer employed by the APD, submitted a proposal on behalf of "EOC3 SECURITY SERVICE." The proposal stated that "EOC3 has currently assembled a[n] experienced and reliable team of A.P.D. officers on Staff, these officers are a part of the nucleus of our operations." Four other security services also participated in the bidding process.

At the time of the bidding, Deputy Chief Rocker served as the APD's commander of the field operations division, where the majority of uniformed officers were assigned. Rocker had final authority to approve or disapprove applications for off-duty employment otherwise known as "extra job requests" submitted by officers below the rank of captain. All extra job requests from officers holding the rank of captain and above required Harvard's approval. Rocker also was responsible for ensuring the adequacy of resources for traffic control and for security for individuals coming to and leaving games at Turner Field. About a week and a half before the beginning of the baseball season, Rocker contacted T. Herman Graves of the Recreation Authority to discuss the traffic plan and security for the 1997 baseball season. After learning that the Recreation Authority would not be coordinating security inside Turner Field, Rocker contacted Larry Bowman, the director of stadium operations for the Braves. Rocker asked Bowman "what was the plan for the Braves since we know that normally the first game or the first home series is a sell-out because of the fireworks and I wanted to make sure that we had something in place." Bowman informed Rocker that EOC3 would be providing security at Turner Field. Rocker expressed concern because Cox, as a senior patrol officer, "could not supervise other patrol officers."

Rocker arranged to meet with Cox, "so we could get this resolved." Rocker explained that since Cox could not supervise other officers, "the purpose for my meeting with Cox and his company [was] to find out exactly how this thing was going to work." Rocker wanted

to ascertain whether Cox planned to function as the owner of the company while having someone else perform the task of supervisor. Upon learning that Cox wanted "to hire my SWAT Commander to be the supervisor," Rocker stated that "I was not comfortable with that because I never know when I might have a SWAT situation." He suggested that Cox "look at hiring another supervisor" and Cox agreed to do so.

Rocker testified that after the meeting, he informed the Chief that the issue regarding supervision had been resolved satisfactorily but that an issue with communications remained "that was not in my shop." Rocker explained that "my concern now is I have 40 or 50 off-duty officers, if they don't have their own dedicated frequency, then they're going to be on Zone 3, which is the busiest zone for volume of calls in the city." Rocker testified that "Chief Harvard had another concern" that related to the Ethics Board and conflicts of interest.

In a March 12, 1997 letter, Bowman informed Cox and EOC3 that several internal APD procedural requirements needed to be resolved, specifically "off-duty assignment approval." Bowman told EOC3 that the failure to address and resolve those matters would preclude EOC3 from providing police services at Turner Field. Bowman advised, "I will need to receive written confirmation verifying resolution of these issues. Failure to bring these issues to acceptable closure by March 19, 1997 may force the Atlanta Braves to fulfill our police service needs through another contractor."

By Rocker's recollection, the night before the first game, "Chief Harvard made the decision that she was not going to allow the extra job permit to be approved." Rocker testified that the Chief directed him to cancel the job requests. Rocker testified that "her concern at that time . . . was that the Ethics Board had ruled some time in the past that an officer with a security company hiring off-duty Atlanta Police Officers constituted a conflict of interest." Harvard confirmed that she had sought legal advice on the underlying ethics issue and testified that she "relied on the law department to research it." Harvard testified that "they told me . . . allowing an officer to be on the payroll of another officer, yes, that could be perceived as a conflict of interest." Rocker testified that when he told the Chief that "there were other officers that had security companies," her response had been, "we'll handle this and then we will take care of the other officers with those companies."

To execute the Chief's directive, Rocker told the commander of Zone 3, "to advise Cox that his company would not be providing security for Turner Field." Rocker recalled having to scramble to find officers to provide security for the first home series of the Braves.

For the first 30 days of the baseball season, the Braves paid the City directly for the use of APD officers to provide security at Turner Field. Thereafter, the Braves hired APD Lieutenant Birdia Brown to coordinate security for the remainder of 1997. The next year, Bowman met with Harvard and, based upon her recommendation, Bowman hired Gordon, a major in the APD, as coordinator of security, a position Gordon also held in 1999 and 2000.

In entering summary judgment, the trial court determined that EOC3 had failed to establish a prima facie case of tortious interference with business relations. Among other findings, the trial court specifically determined that EOC3 failed to prove: "(1) that Defendants acted without privilege or legal justification; (2) that Defendants acted with malicious intent to injure Plaintiffs; or (3) that Defendants were strangers to the business relationship."

1. EOC3 contends that the trial court erred in ruling that the named defendants were not strangers to the prospective business relationship between EOC3 and the Braves. We disagree.

Summary judgment is appropriate when a defendant, who will not bear the burden of proof at trial, points out the absence of evidence of an essential element of the plaintiff's prima facie case.[2] This is such a case. To recover for tortious interference with business relations, a plaintiff must establish that the defendant: "(1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with [the plaintiff]; and (4) caused [the plaintiff] financial injury."[3] "To sustain a claim for intentional interference with business relations, the tortfeasor must be an 'intermeddler' acting improperly and without privilege."[4] To be liable for tortious interference with business relations, one must be a stranger to the business relationship giving rise to and underpinning the contract.[5] But, where "a defendant had a legitimate interest in either the contract or a party to the contract," he is not a stranger to the contract itself or to the business relationship giving rise thereto and underpinning the contract.[6] Nor does the fact that a defendant did not sign the contract preclude a finding that he was no stranger to the

[2] *Kolomichuk v. Brunos, Inc.*, 230 Ga. App. 638, 639 (497 SE2d 10) (1998).

[3] (Footnote omitted.) *Janet Ricker Builder, Inc. v. Gardner*, 244 Ga. App. 753, 755 (4) (536 SE2d 777) (2000).

[4] *Renden, Inc. v. Liberty Real Estate &c.*, 213 Ga. App. 333, 336 (2) (b) (444 SE2d 814) (1994).

[5] *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 609-610 (2) (503 SE2d 278) (1998).

[6] *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 741 (492 SE2d 526) (1997).

contract.[7] In sum, "all parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships."[8] Moreover, "the applicability of the 'stranger doctrine' is the same for [tortious interference with a business relationship] as for tortious interference with a contractual relationship."[9] For this reason, "[p]roof that [the defendant] was no stranger to the business relations at issue is fatal to [the plaintiff's] claim of tortious interference with business relations."[10]

In this case, EOC3 failed to show that the named defendants were strangers to the prospective business relations at issue. On the contrary, the security services that formed the basis of EOC3's proposal were to be provided by off-duty APD officers. All APD officers served under the command of Harvard, and Rocker commanded the majority of uniformed officers. In her capacity as Chief of the APD, Harvard was ultimately responsible for overseeing the off-duty employment policy for the APD.

The proposal that EOC3 submitted to the Braves bore the title "PROPOSAL FOR A.P.D. [(Atlanta Police Department)] SECURITY SERVICE." In the body of the proposal, EOC3 advised that it "has currently assembled a[n] experienced and reliable team of A.P.D. officers on Staff." By offering the services of APD personnel, EOC3 created the circumstances which brought the City and its police department into the business relationship between EOC3 and the Braves. By submitting a proposed contract providing for the services of off-duty APD personnel, EOC3 invoked the APD's internal procedures for extra job requests because all APD officers were subject to such procedures. Plainly, the APD had a legitimate interest in both the contract itself and those involved in executing it.

Under these circumstances, the evidence clearly establishes that the City, Harvard, and Rocker were not strangers to the business relations between the Braves and EOC3. Therefore, we find that the "stranger doctrine" foreclosed the tortious interference claim as a matter of law.[11]

2. In light of our finding that Harvard, Rocker, and the City were not strangers to EOC3's security services proposal, we need not reach the remaining issues.

*Judgment affirmed. Blackburn, P. J., and Ellington, J., concur.*

---

[7] See id.

[8] (Citation omitted.) *McLane,* supra, 269 Ga. at 610.

[9] Id. at 609, n. 2.

[10] *Voyles v. Sasser,* 221 Ga. App. 305, 306 (3) (472 SE2d 80) (1996).

[11] *Physician Specialists in Anesthesia, P.C. v. MacNeill,* 246 Ga. App. 398, 406 (4) (539 SE2d 216) (2000); *Voyles,* supra at 306 (3) (proof that defendant was no stranger to the business relations at issue is fatal to a tortious interference claim).

DECIDED MARCH 17, 2004.

*Steven K. Leibel & Associates, Steven K. Leibel, Michael T. McCulley*, for appellants.
*Serena L. Sparks, Jerry L. DeLoach*, for appellees.