A10A0733, A10A0734. ASC CONSTRUCTION EQUIPMENT
USA, INC. v. CITY COMMERCIAL REAL ESTATE, INC.;
and vice versa.
(693 SE2d 559)

ELLINGTON, Judge.

City Commercial Real Estate ("City") brought this action in the Superior Court of Gwinnett County against ASC Construction Equipment USA, Inc. ("ASC"), alleging, in various contract and tort claims, that ASC acted improperly to deprive City of its commission on the construction of a building for ASC by a contractor City introduced to ASC. A jury found in favor of City on its claim for tortious interference with business relationships, as well as two alternative claims for compensatory damages. In addition to compensatory damages, the jury awarded City punitive damages, based on its finding of a specific intent to harm. In Case No. A10A0733, ASC appeals the denial of its motions for a directed verdict and for judgment notwithstanding the verdict, contending, inter alia, that it was not a stranger to any business relationship City had with the contractor and, therefore, it cannot be held liable for interfering with that relationship. ASC further contends that, absent a valid claim for tortious interference with business relationships, it cannot be held liable for punitive damages in any amount. In Case No. A10A0734, City cross-appeals, contending the trial court erred in granting ASC's motion for a directed verdict on City's claim for fraud. For the reasons explained below, we reverse in part and remand.

> [O]n appeal from a trial court's rulings on motions for directed verdict and judgment notwithstanding the verdict, we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments notwithstanding the verdict are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

(Citation and punctuation omitted.) *Fertility Technology Resources v. Lifetek Med.*, 282 Ga. App. 148, 149 (637 SE2d 844) (2006).

Viewed in this light, the record shows the following. In August 2005, ASC engaged City to serve as ASC's exclusive real estate agent in the Atlanta metropolitan area. At the time, ASC needed two new

showrooms in the Atlanta area for its construction equipment sales. In the likely event that suitable existing buildings were not available, one option was to find raw land for "build to suit to own" deals, in which a developer would take title to a parcel, construct the building or supervise its chosen contractor in constructing the building, and then sell the improved property to ASC. Because ASC's parent company, Volvo Construction Equipment, had agreed to subsidize a lease, however, ASC preferred "build to suit to lease" deals, in which a developer would take title to a parcel, construct or supervise the construction of the building, and then lease the improved property to ASC.

City and ASC did not execute a written contract providing for City's compensation.[1] Instead, ASC's representative verbally agreed to pay what City's president, Rick Lackey, described as "normal and customary" commissions for the industry, depending on how each deal was ultimately structured. City's commission would be factored into each deal, as a line item, and paid directly by the developer. City and ASC both understood that, even if indirectly, ASC would ultimately pay City's commissions, because it was paying for the use or ownership of the buildings. In the case of a build-to-suit-to-lease deal, City's commission would be the first month's rent plus four percent of the remaining lease payments. In the case of a build-to-suit-to-own deal, City's commission would be five percent of the costs of construction, in addition to five percent of the purchase price of the land.

As expected, City was unable to locate suitable existing buildings. Because of the need for new construction and ASC's preference for build-to-suit-to-lease deals, City's initial tasks were to locate fitting parcels and to issue Requests for Proposal to developers. Within two weeks of being engaged, City procured contracts on two parcels that fit ASC's requirements; City received a five percent commission on the sales. City sent Requests for Proposal to 11 developers, including Seefried Properties. As a condition of submitting a proposal, each of the developers executed an agreement with City, promising to pay City's commission if selected by ASC to build and lease the property to ASC.

In response to the Requests for Proposal, City received five proposals; City's representatives evaluated the proposals and selected four developers to attend a pitch meeting with ASC on March 28, 2006. City asked each developer to bring someone to the meeting

---

[1] ASC's representative signed a letter that confirmed City's exclusive engagement, but which did not address compensation. The purpose of the letter was to notify the marketplace that City represented ASC, because ASC had previously been represented by another firm.

who could answer any construction questions. Three of the developers also provided construction services and brought someone from the construction side of their own companies. The one developer that did not have an in-house contractor, Seefried, brought a partner from Catamount Constructors, a contractor that had made an attractive bid on the project. Before the March 28 meeting, neither City nor ASC had had any contact with Catamount. Although Seefried anticipated hiring Catamount if Seefried won the contract, because Catamount's bid was the lowest Seefried had received, Seefried and Catamount did not have a contract regarding the ASC proposal, and so it was not obligated to do so. According to Seefried's representative, Catamount was for the same reason free to contract directly with ASC without involving Seefried.

One week before the March 28 meeting, ASC's board of directors voted to abandon the earlier plan for build-to-suit-to-lease deals and had decided instead to pursue constructing buildings to own without using a developer. No one from ASC informed City before the meeting of this change in direction. Because City's efforts were still focused on the build-to-suit-to-lease option, which would necessarily involve a developer that would bill ASC for City's commission, City did not ask anyone from Catamount to sign a commission agreement before the meeting.

After the March 28 meeting, ASC told City that the lease terms being offered were unaffordable and that ASC wanted to explore a build-to-suit-to-own deal. According to Lackey, ASC directed City to secure construction estimates from two of the developers, including Seefried. ASC's representative, Nuno Colaco, suggested that ASC would not owe City any commission on a building contract if ASC engaged the contractor directly, rather than contracting with one of the developers City had presented. According to Lackey, when he protested being denied a commission on any building contract, Colaco promised that City would receive its commission on any build-to-suit-to-own deal.[2]

At the beginning of City's representation, ASC had agreed that it would not communicate directly with any of the developer teams that were being considered; rather, all communications about the deals were to be channeled through City. Despite this agreement, without involving City, Colaco contacted the partner from Catamount, Scott Reynolds, whom Seefried had brought to the March 28 meeting, and asked for a quote for a direct building contract that did not involve a developer. As requested, Catamount sent ASC a detailed price quote. A Seefried executive cautioned Reynolds to

---

[2] Colaco denied agreeing to this.

remember that City had represented ASC as its broker and would expect to be paid even if ASC did not hire Seefried or one of the other developers. As he predicted, City asked Catamount to sign a commission agreement. Reynolds contacted ASC's representative, who told Reynolds that ASC was working to resolve the issue with City and that Catamount should not sign any agreement with City. Reynolds agreed to move forward only if ASC would indemnify Catamount for any claims by City; ASC agreed to do so. Reynolds never signed City's commission agreement. On April 24, 2006, ASC formally terminated City's engagement. ASC then contracted with Catamount to build one of ASC's buildings for a total cost of $5.2 million; City received no commission on the contract.

In this suit, City asserted claims for breach of contract, promissory estoppel, quantum meruit, tortious interference with contract and business relationships, fraud and negligent misrepresentation, punitive damages for a specific intent to cause harm, and attorney fees pursuant to OCGA § 13-6-11.[3] At the close of City's evidence, the trial court granted ASC's motion for a directed verdict as to City's claim for fraud, but denied ASC's motions for a directed verdict as to City's claims for breach of contract, tortious interference with business relationships, and punitive damages. The trial court ruled that the punitive damages claim could only be sustained under the tortious interference claim. The jury found in City's favor on its claims for promissory estoppel, quantum meruit, and tortious interference with business relationships. The jury awarded City $260,000 in compensatory damages, $27,350 in prejudgment interest, and $180,323.89 in attorney fees on each of these alternative claims. The jury also found that ASC specifically intended to harm City and awarded City $1.25 million in punitive damages. After the court entered judgment in accordance with the jury's verdict, ASC moved for judgment notwithstanding the verdict as to City's claim for tortious interference with business relationships and the associated punitive damages and attorney fee awards. The trial court denied ASC's motion.

### Case No. A10A0733

1. ASC contends that, as a matter of law, it was not a stranger to any business relationship between City and Catamount and, therefore, that the trial court erred in denying ASC's motion for a directed

---

[3] In addition, City asserted claims for conversion and breach of the duty of good faith and fair dealing. The trial court granted ASC's motion for a directed verdict as to these counts. City does not raise any claim of error with regard to that ruling.

verdict as to City's claim for tortious interference with business relationships.

Georgia law recognizes a claim by a person or business entity that is injured by another's wrongful interference with prospective or inchoate property rights that the plaintiff has, or at least hopes to have, as a result of the pursuit of the plaintiff's occupation or business. Charles R. Adams, Ga. Law of Torts § 33-3 (2009-2010 ed.).

> To recover under a theory of tortious interference with business relations, a plaintiff must show [that the] defendant: (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused [the] plaintiff financial injury.

(Citation and punctuation omitted.) *Roofing Supply of Atlanta v. Forrest Homes,* 279 Ga. App. 504, 507 (2) (632 SE2d 161) (2006). The first element's requirement that the tortfeasor acted "without privilege" requires proof that the defendant was an intermeddler or "stranger" to the business relationship at issue. *Cox v. City of Atlanta,* 266 Ga. App. 329, 332 (1) (596 SE2d 785) (2004). An entity that is a party "to an interwoven contractual arrangement" is not a stranger to any of the contracts or business relationships that are part of the contractual arrangement and cannot be held "liable for tortious interference with any of [those] contracts or business relationships." (Citation omitted.) *Atlanta Market Center Mgmt. Co. v. McLane,* 269 Ga. 604, 610 (2) (503 SE2d 278) (1998).

In this case, City claimed that ASC tortiously interfered with its business relations when it induced Catamount not to enter into a commission agreement with City. As a result, City was required to show that ASC was a stranger to the prospective commission agreement. It is undisputed, however, that City's purpose in seeking the commission agreement with Catamount was to have Catamount act as a conduit for the commission City claimed (and the jury found) it had earned from ASC for the work it did for ASC during the nine months it served as ASC's exclusive broker. The object of ASC's interference, that is, the prospective commission agreement between City and Catamount, was a mechanism for effectuating the verbal agreement between City and ASC regarding City's compensation. Based on this, we conclude that the evidence presented no basis for the jury to find that ASC was a stranger to the City's business

relationship with Catamount.[4] Consequently, the trial court erred in denying ASC's motion for a directed verdict as to Count 4 of City's complaint, its claim for tortious interference with contract and business relationships. As noted above, City's claims for promissory estoppel and quantum meruit were alternative bases for the jury's award of compensatory damages. ASC raised no claim of error regarding these claims, Counts 2 and 3, and, therefore, this appeal presents no basis for reversing the jury's award of compensatory damages in the amount of $467,673.89.

2. ASC further contends that, absent a valid claim for tortious interference with business relationships, it cannot be held liable for punitive damages in any amount. Because we have determined that the trial court erred in denying ASC's motion for a directed verdict on tortious interference, see Division 1, supra, and because that claim was the only claim submitted to the jury which could support an award of punitive damages, the punitive damages award cannot stand.[5] OCGA § 13-6-10 ("Unless otherwise provided by law, exemplary damages shall never be allowed in cases arising on contracts."); *Hardwick v. Williams*, 265 Ga. App. 752, 753 (595 SE2d 596) (2004) ("[P]unitive damages are not recoverable in actions for breach of contract.") (footnote omitted). The judgment is reversed to the extent it effectuates the jury's award of punitive damages.

---

[4] See *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. at 610 (2) (A contract between a real estate broker and its employee was interwoven with a contract between the broker and the owner of a large commercial building that granted the broker the exclusive right to procure tenants for the building, and, therefore, the owner was not, as a matter of law, a stranger to the employee's employment contract.); *Cox v. City of Atlanta*, 266 Ga. App. at 333 (1) (The city, police chief, and deputy police chief had a legitimate interest in enforcing the city's off-duty employment policy and, therefore, were not, as a matter of law, strangers to the business relations between the Atlanta Braves and a security contractor that proposed a contract to provide security services at baseball games using off-duty city police officers.); *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 741 (492 SE2d 526) (1997) (The buyer of a leasehold interest in a building that was damaged by fire before the asset purchase agreement closed was not, as a matter of law, a stranger to the contract between the seller and the company the seller hired to repair the fire damage.); *Renden, Inc. v. Liberty Real Estate &c.*, 213 Ga. App. 333, 336 (2) (b) (444 SE2d 814) (1994) (A shopping center owner was an essential entity in a prospective lessor/lessee/sublessee relationship, and, therefore, the owner was not, as a matter of law, a stranger to the prospective sublease.); *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting*, 205 Ga. App. 57, 60-61 (1) (421 SE2d 295) (1992) (Where the buyer of a new radio station, the seller, and the lenders that financed the construction were all parties to a comprehensive set of contracts which provided for the financing, construction, and transfer of ownership of the radio station, the buyer was an essential party to the contract between the seller and its lenders and, therefore, was not, as a matter of law, a stranger to that relationship.).

[5] Because punitive damages were not available in any amount, ASC's argument that there was no evidence that it had a specific intent to harm City and, therefore, that the trial court erred in not reducing the punitive damages award to $250,000 pursuant to OCGA § 51-12-5.1 (g) is moot.

## Case No. A10A0734

3. City contends the trial court erred in granting ASC's motion for a directed verdict as to Count 9 of City's complaint, its claim for fraud.[6] We agree.

In order to recover for fraud, a plaintiff is required to show

(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages. In all cases of fraud involving a concealment of a material fact, scienter, or knowledge of the alleged falsehood, is an essential element of the tort.

(Punctuation and footnotes omitted.) *Argentum Intl. v. Woods*, 280 Ga. App. 440, 443-444 (2) (634 SE2d 195) (2006). "Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." OCGA § 23-2-53.[7] "[W]hether the particular circumstances of a case give rise to an obligation to disclose will generally be a jury question." (Citation and punctuation omitted.) *Eason Publications v. NationsBank*, 217 Ga. App. 726, 730 (3) (458 SE2d 899) (1995). Because fraud is inherently subtle, "[f]raud may be proved by slight circumstances, and whether a misrepresentation is fraudulent and intended to deceive is generally a jury question." (Citation and punctuation omitted.) *BTL COM v. Vachon*, 278 Ga. App. 256, 261 (1) (628 SE2d 690) (2006).

City contends that ASC omitted a material fact when it failed to disclose before the March 28 meeting that ASC's board of directors had decided to own the buildings and to engage a contractor directly without using a developer. City contends that it justifiably relied to its detriment on this omission when it failed to require Catamount to sign a commission agreement before being allowed to attend the meeting with ASC. We conclude that there was evidence from which the jury could infer that ASC, through its representatives, failed to disclose a material fact, that it had decided to directly engage a

---

[6] City filed its cross-appeal conditioned on a ruling favorable to ASC in the main appeal, Case No. A10A0733. Because we have ruled in ASC's favor in the main appeal, we consider City's cross-appeal on the merits. Cf. *SAKS Assocs. v. Southeast Culvert*, 282 Ga. App. 359, 365-366 (4) (638 SE2d 799) (2006) (Where the appellee filed a cross-appeal conditioned on the reversal of the judgment in the main appeal, and this Court affirmed the judgment in the main appeal, the conditional cross-appeal was deemed withdrawn.).

[7] See also OCGA § 51-6-2 (a) ("Mere concealment of a material fact [if] done in such a manner as to deceive and mislead will . . . support an action" for fraud.) (punctuation omitted).

contractor to construct buildings for ASC to own. The jury was authorized to find that ASC had an obligation to communicate that fact, given the compensation scheme that was in place. The jury was also authorized to find that ASC intended, by failing to disclose this fact to City before the March 28 meeting, to induce City not to secure the agreement of any independent contractors City might bring to the table to include a commission for City in any building contract the contractor entered into with ASC. Finally, the jury was authorized to find that City justifiably relied on ASC's omission and suffered the loss of the commission that would have resulted from such an agreement. Accordingly, the trial court erred in granting ASC's motion for a directed verdict on Count 9, City's claim for fraud. *First Union Nat. Bank v. Davies-Elliott, Inc.*, 207 Ga. App. 791, 793 (2) (429 SE2d 161) (1993); *Tower Financial Svcs. v. Jarrett*, 199 Ga. App. 248, 250 (2) (404 SE2d 622) (1991).

We reject ASC's argument that, because City suffered a purely economic loss, that is, the loss of its expected commission, the "economic loss rule" bars City's fraud claim.

> The purpose of the economic loss rule is to distinguish between those actions cognizable in tort and those that may be brought only in contract. . . . The economic loss rule generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort.

(Punctuation and footnotes omitted.) *City of Cairo v. Hightower Consulting Engineers*, 278 Ga. App. 721, 728 (4) (629 SE2d 518) (2006). The economic loss rule, however, is subject to an exception in certain cases of misrepresentation. Specifically,

> one who supplies information . . . in any transaction in which [that person] has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used. This liability is limited to a foreseeable person or limited class of persons for whom the information was intended, either directly or indirectly.

(Punctuation and footnote omitted.) Id. at 729 (4). Given the nature of City's claim for fraud, the economic loss rule does not limit City to its contractual remedies. Id.

4. In light of our holdings in Divisions 1 and 3, supra, this case

is remanded for additional proceedings consistent with this opinion.

*Judgment affirmed in part and reversed in part, and case remanded. Andrews, P. J., and Doyle, J., concur.*

DECIDED MARCH 31, 2010.

Miller & Martin, Bryan M. Cavan, Alston & Bird, Elena H. Eisenstein, for appellant.

Andrew, Merritt, Reilly & Smith, Paul E. Andrew, Withrow, McQuade & Olsen, Terrence McQuade, Jeffrey T. Holm, for appellees.