**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**February 22, 2023**

# In the Court of Appeals of Georgia

A22A1209. BRISTOL CONSULTING GROUP, INC. et al. v. D2
PROPERTY GROUP, LLC et al.

DILLARD, Presiding Judge.

In this civil action arising out of a failed commercial real estate deal, Bristol Consulting Group, Inc.; American Business Group, Inc.; and Donnie Hyder—the principal of both entities[1]—sued D2 Property Group, LLC; John F. Dalton; and Brian M. Dalton[2] to collect on a promissory note and personal guarantees. The Daltons filed counterclaims of fraud, conversion, promissory estoppel, and unjust enrichment, and

---

[1] For ease of reference and the sake of clarity, we refer to Bristol Consulting Group, Inc. ("Bristol"); American Business Group, Inc. ("ABG"); and Donnie Hyder collectively as "Hyder." We also refer to Bristol and ABG collectively as "the Hyder entities."

[2] For ease of reference and the sake of clarity, we refer to D2 Property Group, LLC ("D2"), John F. Dalton, and Brian M. Dalton collectively as "the Daltons."

successfully moved for summary judgment as to Hyder's suit on the note (which this Court affirmed).[3] Following trial, a jury rendered a verdict in favor of the Daltons and awarded them over $800,000 in damages. Now, Hyder contends the trial court erred by (1) allowing jurors to submit questions to be posed to the witnesses; (2) denying his motion for a directed verdict as to the Daltons' fraud claim; and (3) denying his motion to amend the verdict form. For the following reasons, we affirm the jury's verdict and the trial court's judgment.

Construed in favor of the jury's verdict,[4] the evidence shows that in March 2015, the Daltons formed D2 as a corporate vehicle to purchase residential real estate for investment purposes. Not long after that, the Daltons met Donnie Hyder after purchasing a duplex he was renovating. And based on the success of that transaction, the Daltons and Hyder began an ongoing business relationship. Specifically, Hyder assisted the Daltons in identifying real estate investment opportunities, managing renovations for their real estate purchases, and managing the tenants who rented the purchased properties. Indeed, over the next year or so, the Daltons purchased seven

[3] *See Bristol Consulting Grp., Inc. v. D2 Prop. Grp., LLC*, A20A0137 (June 10, 2020).

[4] *See Horton v Hendrix*, 291 Ga. App. 416, 416 (662 SE2d 227) (2008) (noting that in an appeal of a civil jury trial, the evidence is construed in favor of the verdict).

2

additional residential rental properties, which Hyder similarly renovated and managed.

In early 2016, Hyder approached the Daltons about a potential multimillion dollar commercial real estate project involving mixed retail/residential property located on Verbena Street in southwest Atlanta—the "Verbena Street project." Hyder assured the Daltons he would be able to put together a deal to finance, purchase, renovate, and lease the Verbena Street project, and convinced them to provide an initial investment of $150,000. In doing so, Hyder advised the Daltons that he had secured the right to purchase the property for $3,000,000, and that, following financing, he would return $100,000 of their initial investment. The parties further discussed that Hyder would assist the Daltons in obtaining financing for the property acquisition and renovation costs, supervise redevelopment of the property, and manage the property when it was ready for tenant occupancy. And in exchange for performance of these duties, Hyder would receive a 25 percent ownership interest and an estimated $1,000,000 cash payout after the project was completed. But no development agreement for the project was ever reduced to writing.

In April 2016, at the same time he was engaging in discussions with the Daltons about the project, Hyder and the Verbena Street property owners—Atlanta

Beverly, LLC and Atlanta Plaza, LLC—entered into a 60-day purchase option agreement that allowed Hyder to purchase the property, including both the residential and retail parcels, for $1,100,000—as opposed to the $3,000,000 purchase price he represented to the Daltons. Hyder did not disclose the details of this agreement to the Daltons, which included the fact that the retail parcels—which were actually owned by Atlanta Plaza—were excluded from the Daltons' acquisition. Instead, Hyder told the Daltons that he secured financing through an entity called Vittorio Group, which would lend $12,000,000 for the project if the Daltons provided a deposit of $230,000 to be held in escrow. But because the Daltons did not have $230,000 on hand, they borrowed that amount through a short term loan from another lender, Fowler Financial, LLC, whose principal was a friend of the Daltons. But contrary to Hyder's representations, the $230,000 ended up being paid to the Vittorio Group directly, rather than being held in escrow, and the Vittorio Group provided no further financing.

On June 30, 2016, Hyder's purchase option for the Verbena Street property expired because he was unable to secure the necessary financing. Even so, Hyder failed to return $100,000 of the Daltons' initial investment as represented. But rather than abandon the deal, Hyder advised the Daltons that the property could now be

4

purchased for $1,200,000 and the project could still be funded if they obtained $2,000,000 in bridge financing. So, the Daltons borrowed the required funds—again from Fowler Financial. Then, on July 12, 2016, Hyder brought in his attorney to handle the closing and provide information for the closing documents, which included an incomplete HUD closing settlement statement. Additionally, at Hyder's direction (and without the Daltons' knowledge), his attorney prepared a deed transferring the property's retail parcels to Hyder's company, Bristol. The closing documents also included a promissory note obligating D2 to repay Bristol $1,000,000 on or before the maturity date of January 11, 2017, and at the same time, the Daltons executed personal guarantees to ensure repayment of the $1,000,000 note.

At the closing, $1,200,000 was paid to Atlanta Beverly, a portion of the Verbena Street property was transferred to D2 (subject to a deed of trust to Fowler Financial), the initial $230,000 borrowed from Fowler Financial was repaid, and Bristol received $450,000 for carrying costs and to renovate the property. But the $450,000 was never used for the Verbena Street project, and Hyder never secured financing for the project as he claimed he would do. As a result, without the long-term financing necessary to complete the project, the Daltons could not make payments on the $2,000,000 bridge loan and ultimately defaulted, resulting in Fowler

Financial selling the property at foreclosure in September 2017. And while the Daltons attempted to reacquire the property, they never succeeded in doing so, and the project was not developed.

Thereafter, Hyder failed to return any of the funds the Daltons provided to him and his entities. Instead, Hyder continued requesting funds from the Daltons for various purposes allegedly related to attempts to reacquire the Verbena Street property. And in December 2017, Hyder began demanding that the Daltons make payments under their guarantees to the promissory note. They refused to do so, and thus, on March 30, 2018, Hyder filed suit against them, attempting to enforce the promissory note and guarantees. The Daltons filed an answer and counterclaims of fraud, conversion, promissory estoppel, unjust enrichment, and tortious interference.

Discovery then ensued, after which the parties filed cross-motions for summary judgment as to the claims presented in the complaint, counterclaim, and third-party complaint, respectively. Following a hearing, the trial court entered an order granting the Daltons' motion for summary judgment based on its finding that the promissory note and personal guarantees were void and unenforceable. And in that same order, the trial court denied Hyder's motion for summary judgment based on its finding that

genuine issues of material fact remained as to the Daltons' counterclaims. Hyder appealed that order, but in an unpublished opinion, we affirmed the trial court.[5]

After the case was remanded, it proceeded to a jury trial, in which the parties presented the aforementioned evidence. And at the close of the Daltons' case, Hyder moved for a directed verdict. After hearing argument, the trial court granted a directed verdict as to the Daltons' tortious interference claim but denied it as to all other claims. Then, at the conclusion of the trial, the jury rendered a verdict in favor of the Daltons and awarded $821,100 in total damages against Hyder. This appeal follows.

1. Hyder first contends the trial court erred in denying his motion for a mistrial based on the court allowing jurors to submit questions to be posed to the witnesses. We disagree.

When ruling on a motion for mistrial, a trial court is "vested with broad discretion, and this Court will not disturb the ruling absent a manifest abuse of discretion."[6] Indeed, unless it is apparent that "a mistrial is essential to preservation

_____

[5] *See supra* note 1.

[6] *Sw. Emergency Physicians, P.C. v. Quinney*, 347 Ga. App. 410, 413 (1) (819 SE2d 696) (2018) (punctuation omitted); *accord Ga. Dep't of Corr. v. Couch*, 312 Ga. App. 544, 548 (2) (718 SE2d 875) (2011); *see Bulgin v. Ga. Dep't of Transp.*, 292 Ga. App. 1, 4 (5) (663 SE2d 730) (2008) (holding that the trial court is vested with discretion in determining whether to grant a mistrial, and we review its ruling

7

of the right of fair trial, the discretion of the trial judge will not be interfered with" by Georgia's appellate courts.[7]

And here, in its preliminary instructions to the jury (just prior to opening statements), the trial court informed the jurors that they would be permitted to submit written questions to the testifying witnesses. Specifically, the trial court explained that during the witnesses' testimony, the jurors could write their questions on a note card, the court and counsel for both parties would review those questions, and the court would then ask the witnesses questions it deemed unobjectionable. The trial court further explained to the jurors that (1) they "should draw no conclusions or inferences from the fact that some of your questions are asked, and some of them are not, because questions are never evidence," (2) "[w]hat the lawyers say is not evidence, [and] your questions are not evidence," and (3) "[i]t's the answers, the witness testimony that is evidence." Neither party objected to these instruction at that time.

---

in this regard for an abuse of discretion).

[7] *Clack v. Hasnat*, 354 Ga. App. 502, 507 (3) (841 SE2d 210) (2020) (punctuation omitted); *see Quinney*, 347 Ga. App. at 413 (1) (noting that in reviewing the trial court's refusal to grant a mistrial, "we consider whether the remarks affected or infected the verdict, and whether it is apparent that a mistrial is essential to the preservation of the right to a fair trial" (punctuation omitted)).

Following the parties' examination of the first witness (the owner of Atlanta Beverly), the trial court asked several submitted questions. When that witness concluded his testimony, and the jury left the courtroom for a break, the trial court informed the parties that all of the jurors' written questions—whether asked or not—would be made part of the record as an exhibit. The trial court then asked juror-submitted questions to the next witness, John Dalton, following his examination by the parties. No party objected to those questions. But after John Dalton's testimony (while the jury was on a lunch recess), Hyder's counsel asked that juror questions *not* asked of the witnesses be read into the record. The trial court declined this request, but reiterated that every question submitted would be made part of the record as an exhibit. Thereafter, three more witnesses testified, and the trial court also asked them juror-submitted questions with no objections.

Then, just before the testimony of Hyder's closing attorney, Hyder moved for a mistrial, arguing the trial court's procedure for asking juror-submitted questions was unfair because it made it more difficult for him to make contemporaneous objections to the unasked questions. Hyder further contended that not asking certain questions resulted in the jurors submitting those unasked questions feeling slighted. The trial court denied the motion, noting that in its preliminary instructions it informed the

jurors that they should draw no inferences if their submitted questions were not asked. And as to Hyder's argument that not reading unasked questions into the record made it more difficult to contemporaneously object to their exclusion, the court explained that nothing prevented Hyder's counsel from taking notes at the time the court and parties reviewed the questions to determine which ones would be asked; but Hyder's counsel had eschewed doing so thus far. Finally, the trial court, again, repeated that all of the written questions—regardless of whether they were asked—would be included in the record and that it would continue to give counsel opportunities to object out of the presence of the jury.

Now, Hyder argues the trial court erred in denying his motion for a mistrial, reiterating his contention that the court's procedure for asking witnesses questions submitted by the jurors was improper. But this contention lacks merit. The trial court followed the same procedure for juror questions explicitly approved by the Supreme Court of Georgia in *Benton v. State*, affirming this *same* trial court's use of the procedure.[8] In doing so, the *Benton* Court explained that "while jurors in Georgia courts may not ask questions of witnesses directly, a trial court may receive written questions from the jury and ask those questions which the court finds proper, or allow

_____

[8] 301 Ga. 100, 102 (3) (799 SE2d 743) (2016).

10

counsel for either party to ask a testifying witness the questions found to be proper."[9]

The trial court here did just that. And as previously noted, the trial court allowed

counsel for both parties to review all of the submitted questions before any of them

were chosen, make objections at that time, and take notes as to which questions

would be asked and which would not. As a result, Hyder's complaint that he could

not contemporaneously object to questions *unposed* to witnesses rings hollow.[10]

---

[9] *Id*. at 102 (3) (punctuation omitted); *accord Hernandez v. State*, 299 Ga. 796, 799 (2) (792 SE2d 373) (2016); *Allen v. State*, 286 Ga. 392, 396-97 (3) (687 SE2d 799) (2010); *see Story v. State*, 157 Ga. App. 490, 491 (278 SE2d 97) (1981) ("Upon approval by the court, the question may be asked of the witness by the judge or, if counsel so desires, the question may be asked by counsel for either party."). The trial judge in this matter and in *Benton*—Judge Robert C. McBurney—was also the trial judge in *Hernandez*.

[10] *See Torres v. City of Jonesboro*, 354 Ga. App. 874, 876 (2) (842 SE2d 75) (2020) (noting that "[t]he contemporaneous objection rule provides that counsel must take exception to the alleged error at the earliest possible opportunity in the progress of the case by a proper objection made a part of the record" (punctuation omitted)). In his brief, Hyder discusses several juror questions the trial court declined to ask and seems to argue the relevance of such questions, leaving one to conclude that perhaps his motion for a mistrial is more accurately described as a *post hoc* attempt to challenge evidentiary rulings. But in his reply to the Daltons' brief and their explanations as to why the unasked questions were irrelevant, Hyder is quick to point out that the Daltons' arguments amount to mere speculation, as the trial court only addressed the relevance of one such question on the record. We think Hyder's latter stance to be more prudent and therefore offer no opinion on the relevancy of the unasked juror questions or whether the trial court abused its discretion in refusing to ask such questions.

11

We also find unpersuasive Hyder's claim that the trial court's procedure was somehow improper or unfair because not asking certain questions resulted in the jurors submitting such questions feeling slighted. Indeed, the trial court unequivocally instructed the jury that it should draw no inference if a submitted question was not asked, "and the jury is presumed to follow the instructions of the trial court absent clear evidence to the contrary."[11] Given these circumstances (and echoing our Supreme Court's holdings on this issue), while trial courts must be cautious in soliciting and asking jury questions, we cannot say the trial court here deviated from the proper procedure or otherwise abused its discretion as to the jury questions that were asked or not asked.[12] Consequently, the trial court did not abuse its discretion in denying Hyder's motion to declare a mistrial on this ground.

---

[11] *Ash v. State*, 312 Ga. 771, 781 (2) (865 SE2d 150) (2021); *see Lofton v. State*, 309 Ga. 349, 366 (6) (b) (iv) (explaining that appellate courts presume that juries follow the trial courts' instructions).

[12] *See Benton*, 301 Ga. at 102-03 (3) (holding that trial court did not err in allowing jurors to submit questions to be posed to the witnesses, in light of fact that trial court and counsel for the parties reviewed the questions, and the questions were posed by the trial court once the court found the questions to be proper); *Hernandez*, 299 Ga. at 799 (2) (explaining that trial court did not abuse its discretion by soliciting jury for questions to ask witnesses because court followed proper procedure by having jurors submit their questions to the court, posed questions it found proper to the witnesses, and did not improperly intimate the court's opinion about the evidence when asking such questions).

2. Hyder also maintains the trial court erred in denying his motion for a directed verdict as to the Daltons' counterclaim for fraud in the inducement. Again, we disagree.

It is well established that on appeal from the denial of a motion for a directed verdict or a motion for j.n.o.v., we construe the evidence "in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict."[13] And because the jurors are the sole and exclusive judges of the weight and credit given the evidence, we must construe the evidence with "every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict."[14] Even so, we review questions of law *de novo*.[15]

Under Georgia law, the tort of fraud—including fraudulent inducement—has five elements: "a false representation by a defendant, scienter, intention to induce the

---

[13] *Old Republic Nat'l Title Ins. Co. v. RM Kids, LLC*, 337 Ga. App. 638, 648 (5) (788 SE2d 542) (2016) (punctuation omitted); *accord Cannon v. Barnes*, 357 Ga. App. 228, 231 (2) (850 SE2d 436) (2020).

[14] *Old Republic Nat'l Title Ins. Co.*, 337 Ga. App. at 648 (5) (punctuation omitted); *accord Cannon*, 357 Ga. App. at 231 (2).

[15] *See Old Republic Nat'l Title Ins. Co.*, 337 Ga. App. at 648 (5) (punctuation omitted); *accord Cannon*, 357 Ga. App. at 231 (2).

13

plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff."[16] And importantly, because fraud is "inherently subtle," it may be proved by "slight circumstances, and whether a misrepresentation is fraudulent and intended to deceive is generally a jury question."[17] Here, in their answer and counterclaims, the Daltons asserted a claim of fraud in the inducement, showing that Hyder misrepresented to them that he already had an agreement in place with the owners of the Verbena Street property for the retail parcel to be conveyed to him, rather than to the Daltons (despite telling them otherwise). Additionally, the Daltons demonstrated that Hyder convinced them to fully fund the purchase of the property for $3,000,000—a number much higher than the seller's price. The Daltons further showed that Hyder represented that $450,000 in excess funds from the closing on the property would be used to fund much needed renovations but, instead, used such funds for his own purposes.

---

[16] *Najarian Capital, LLC v. Clark*, 357 Ga. App. 685, 688-89 (2) (849 SE2d 262) (2020) (punctuation omitted); *accord JPMorgan Chase Bank v. Durie*, 350 Ga. App. 769, 771 (2) (830 SE2d 387) (2019).

[17] *Ga. Com. Stores, Inc. v. Forsman*, 342 Ga. App. 542, 554 (2) (803 SE2d 805) (2017) (punctuation omitted); *accord ASC Constr. Equip. USA v. City Com. Real Est.*, 303 Ga. App. 309, 315 (3) (693 SE2d 559) (2010).

Even so, Hyder argues that his motion for directed verdict as to the Daltons' fraud-in-the-inducement claim should have been granted because they failed to prove that they justifiably relied on his representations about the Verbena Street project. And in support of this argument, Hyder points to several instances during the Daltons' testimony in which they acknowledged that they failed exercise sufficient due diligence in investigating his representations regarding the deal. As a result, Hyder claims this testimony, as well as the trial court's acknowledgment of the lack of due diligence by the Daltons during the argument on the motion, demonstrates the Daltons failed to show justifiable reliance as a matter of law. This argument is a nonstarter.

To be sure, in order to prove justifiable reliance, the Daltons must show "the defect could not have been discovered by [them] in the exercise of due diligence in the purchase of the Property."[18] But in stark contrast to situations involving arms-length transactions between buyers and sellers of property, such as those cited by

---

[18] *Clark*, 357 Ga. App. at 689 (2) (punctuation omitted); *see BPP069, LLC v. Lindfield Holdings*, 346 Ga. App. 577, 582-83 (816 SE2d 755) (2018) (noting that when a buyer could have protected itself by the exercise of due diligence, it cannot show justifiable reliance on its part).

15

Hyder,[19] when "a fiduciary relationship exists between the parties, that relationship encompasses a duty to disclose so that suppression of a material fact which a party is under an obligation to communicate constitutes fraud."[20] In this regard, a "confidential relationship" arises when one party is "so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from

---

[19] *See Crawford v. Williams*, 258 Ga. 806, 807 (375 SE2d 223) (1989) ("A party buying real property who makes no attempt to discover the boundaries of the property cannot be said to have 'justifiably relied' on a misrepresentation by the seller regarding those boundaries."); *Clark*, 357 Ga. App. at 693-94 (4) (purchaser at foreclosure sale failed to allege it reasonably relied on any of the information that it deemed inaccurate); *Lehman v. Keller*, 297 Ga. App. 371, 373 (1) (677 SE2d 415) (2009) (holding that purchasers of property failed to exercise due diligence in discovering termite damage in home, by never requesting a copy of inspection report, and thus, their reliance on vendor's alleged misrepresentations about home was not justifiable); *Reeves v. Edge*, 225 Ga. App. 615, 618-19 (2) (484 SE2d 498) (1997) (purchasers of cemetery plot failed to exercise due diligence by attempting to ascertain cemetery's current rules and regulations prior to their installing marker, and thus, warranting summary judgment as to fraud claim); *Hanlon v. Thornton*, 218 Ga. App. 500, 502 (1) (462 SE2d 154) (1995) (finding that purchaser, who failed to make any effort to investigate value of property and existence of adjacent landfill, could not recover on claim of fraudulent misrepresentation with respect to those items).

[20] *Inland Atl. Old Nat'l Phase I v. 6425 Old Nat'l*, 329 Ga. App. 671, 676 (2) (766 SE2d 86) (2014) (punctuation omitted), *disapproved on other grounds by Hanham v. Access Mgmt. Grp., L.P.*, 305 Ga. 414, 418 (3) (825 SE2d 217) (2019); *see* OCGA § 23-2-53 ("Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.").

16

a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."[21] And such a relationship may be created by "law, contract, or the facts of a particular case."[22] Furthermore, since a confidential relationship "may be found whenever one party is justified in reposing confidence in another, the existence of this relationship is generally a factual matter for the jury to resolve."[23]

In this matter, the evidence shows that, based on their success in purchasing a duplex Hyder was renovating, the Daltons and Hyder began an ongoing business relationship, in which the Daltons relied heavily on Hyder to identify additional properties to purchase, oversee the renovations on those properties, and manage the tenants renting those properties. And indeed, over the course of a year, this close business relationship resulted in Hyder assisting the Daltons in finding and purchasing seven residential rental properties, which Hyder then renovated and

---

[21] *Ray v. Hadaway*, 344 Ga. App. 642, 645 (2) (811 SE2d 80) (2018) (punctuation omitted); *accord Douglas v. Bigley*, 278 Ga. App. 117, 120 (1) (a) (628 SE2d 199) (2006).

[22] *Ray*, 344 Ga. App. at 645 (2) (punctuation omitted); *accord Douglas*, 278 Ga. App. at 120 (1) (a).

[23] *Ray*, 344 Ga. App. at 645 (2) (punctuation omitted); *accord Douglas*, 278 Ga. App. at 120 (1) (a).

17

managed for the Daltons. John Dalton, in fact, testified that he considered Hyder a partner in the Verbena Street deal and that they had "a relationship of trust" in that regard. Given these circumstances, there was some evidence to support the jury's conclusion that the Daltons had a relationship with Hyder that justified their reliance on his misrepresentations. As a result, the trial court did not err in denying Hyder's motion for a directed verdict as to the Daltons' fraud-in-the-inducement claim.[24]

3. Finally, Hyder contends the trial court erred in denying his motion to amend the verdict form. Once again, we disagree.

_____

[24] *See Stamps v. JFB Props., LLC*, 287 Ga. 124, 126-27 (694 SE2d 649) (2010) (holding that issue of whether confidential relationship existed between insured and business associate was for jury in a case in which the insured alleged fraud arising out of agreement for the sale of a life insurance policy that associate drafted and insured did not read but thought was merely a loan agreement); *Ga. Com. Stores, Inc.*, 342 Ga. App. at 552-54 (2) (holding that fiduciary relationship between parties was sufficient to create a jury issue as to fraud claim); *Inland Atl. Old Nat'l Phase I*, 329 Ga. App. at 676 (2) (reversing summary judgment dismissing appellant's fraud claim based on finding that genuine issue existed as to whether appellee had a fiduciary obligation to appellant such that it had a duty to disclose material fact regarding manager's capacity to complete work on real estate project); *Abbott Oil Co. v. Rogers*, 302 Ga. App. 439, 442 (691 SE2d 561) (2010) (reversing the trial court's grant of summary judgment on a fraudulent-transaction claim where the transferee was a long-time friend of the debtors and the transferee knew that the debtors owed a substantial debt); *Douglas*, 278 Ga. App. at 120-21 (1) (a) (holding that issue of whether a confidential relationship arose between investor and litigation funding company was for the jury in investor's action alleging fraud).

In the consolidated pretrial order, the parties agreed to a verdict form that separately listed each of the Daltons' claims, followed by a line for the jury to check "yes" or "no" as to whether they found for the Daltons on a particular claim. But after the charge conference, the parties and the trial court engaged in a discussion about whether the verdict form should include a single line for total damages or instead separate damages out to correlate with each of the Daltons' claims. And at the conclusion of this discussion, the trial court ruled in favor of the former option. Then, just after the jury began its deliberations, Hyder brought to the trial court's attention that the verdict form did not distinguish between the three separate defendants for a finding of liability or damages. The trial court agreed this was a potential problem, but the issue was not resolved before it recessed for the night.

The following morning, Hyder moved to amend the verdict form, arguing that any damage awards should be separated for the specific claim and specific defendant. The trial court acknowledged that the verdict form should reflect damages awarded against specific defendants, but it still disagreed with Hyder's contention that damages should also be separated by claim. And after additional argument by the parties, the trial court partially granted Hyder's motion, deciding to amend the verdict form such that it contained a separate damage line for each of the three defendants,

but did not separate damages by the Daltons' specific claims. Shortly thereafter, the jury returned its verdict in favor of the Daltons and found the three defendants liable for separate amounts of damages.

Now, Hyder reiterates the argument made in his motion to amend the verdict form. Specifically, he asserts that the verdict form submitted to the jury violated OCGA § 9-11-49 (a) by failing to properly instruct the jury as to how it could award damages and, thus, essentially mandated joint and several liability for each claim regardless of whether the particular defendant was found liable for that claim. Additionally, Hyder argues the form resulted in an inconsistent verdict. These arguments also lack merit.

Under Georgia law, in a civil case, a verdict that is "contradictory and repugnant is void, and no valid judgment can be entered thereon."[25] Consequently, judgment entered on such a verdict "will be set aside."[26] Nevertheless, turning first to a different statutory guide than that cited by Hyder, OCGA § 9-12-4 directs that "[v]erdicts shall have a reasonable intendment and shall receive a reasonable

---

[25] *Anthony v. Gator Cochran Constr. Co.*, 288 Ga. 79, 79 (702 SE2d 139) (2010) (punctuation omitted).

[26] *Id.* (punctuation omitted).

20

construction," and "[t]hey shall not be avoided unless from necessity." Accordingly, the presumptions are "in favor of the validity of verdicts, and if possible, a construction will be given which will uphold them."[27] Indeed, even if the verdict is ambiguous and susceptible of two constructions, "one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied."[28]

Here, Hyder argues the verdict form ultimately approved by the trial court somehow failed to properly instruct the jury, thereby violating OCGA § 9-11-49 (a). But that statute concerns special verdicts (indeed, it is titled "Special Verdicts"), in which a trial court has a jury answer written questions as to its findings.[29] Thus, this

---

[27] *Id.* at 80 (punctuation omitted); *accord Lucas v. Charles Schwab & Co., Inc.*, 354 Ga. App. 522, 524 (2) (841 SE2d 150) (2020).

[28] *Anthony*, 288 Ga. at 80-81 (punctuation omitted); *accord Lucas*, 354 Ga. App. at 524 (2).

[29] *See* OCGA § 9-11-49 (a) ("The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.").

21

statute is only applicable in certain cases[30] and has no bearing on the verdict form employed in this matter.[31] Additionally, and contrary to Hyder's argument, we are not persuaded the jury verdict and award of damages here is in any way inconsistent, much less void. As previously noted, the jury found in favor of the Daltons as to all of their claims and then awarded them $261,800 from Hyder (individually), $494,800 from Bristol, and $64,500 from ABG. And crucially, there were facts by which the jury could properly allocate the liability for the Daltons' counterclaims among these three defendants; and we will not "substitute our judgment based upon a cold record for that of enlightened jurors who heard the evidence and saw the witnesses."[32]

---

[30] *See* OCGA § 9-11-49 (b) ("Upon written request by any party made on or before the call of the case for trial, it shall be the duty of the court to require the jury to return only a special verdict, as provided in subsection (a) of this Code section, in any case involving equitable relief, mandamus, quo warranto, prohibition, a declaratory judgment, and in any other case or proceeding where special verdicts may be specifically required by law.").

[31] *See King v. Thompkins*, 186 Ga. App. 12, 14 (4) (366 SE2d 340) (1988) (holding that a special verdict form under OCGA § 9-11-49 was not required in fraud case despite defendant's request for such).

[32] *Dunwoody Obstetrics and Gynecology, P.C. v. Franklin*, 363 Ga. App. 90, 97 (2) (870 SE2d 592) (2022) (punctuation omitted); *see Lucas*, 354 Ga. App. at 524-25 (2) (holding that jury verdict was not void when the verdict could reasonably be constructed in a way that upheld it); *Hewitt Assocs. v. Rollins, Inc.*, 308 Ga. App. 848, 853-54 (5) (708 SE2d 697) (2011) (explaining that while verdict form may have been somewhat confusing, evidence was presented such that the jury's verdict could be

Accordingly, the trial court did not err in partially denying Hyder's motion to amend the verdict form.

For all these reasons, we affirm the jury's verdict and the trial court's judgment in favor of the Daltons.

*Judgment affirmed. Mercier and Markle, JJ., concur.*

---

reasonably construed in a way that upheld it).